## CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA.

AT TERM BEGINNING FIRST MONDAY OF NOVEMBER, 1905,

AND

AT TERM BEGINNING FIRST MONDAY OF NOVEMBER, 1906.

(41 South. 332.)

No. 15,385.

DES ALLEMANDS LUMBER CO., Limited,
v. MORGAN CITY TIMBER CO.,
Limited.

(June 30, 1905.   On Rehearing, May 7, 1906.)

1. APPEAL AND ERROR — REASSIGNMENT OF CAUSE—EFFECT.

An agreement of counsel, afterwards sanctioned by the court, for the reassignment of a case, has the effect of setting aside the assignment and placing matters in the situation in which they would have been if no assignment had been made, with the consequence that the timeliness of the filing of an answer to the appeal has to be determined with reference to the assignment thereafter made, and not with reference to the assignment that has been set aside.

2. CONTRACTS — REMEDY FOR BREACH — ELECTION.

When one of the parties breaks the contract, the other party must elect between demanding a dissolution of the contract and ex-

acting a continued performance of it. He cannot have both, and the choice is made once for all.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 1174; vol. 44, Cent. Dig. Specific Performance, § 4.]

3. EVIDENCE — VERBAL ADMISSIONS — WEIGHT AND EFFECT.

Verbal admissions are the weakest kind of evidence, especially when the exact language cannot be given, and when the purpose is to eke out a written contract or to put a particular interpretation upon such contract.

[Ed. Note.—For cases in point. see vol. 20, Cent. Dig. Evidence, §§ 1029, 1050.]

4. CONTRACTS—FORM.

To confirm a conversation by letter is a good business precaution. The letter should be written as soon as possible after the close of the conversation, and surely not later than the night of the same day if circumstances permit.

5. ESTOPPEL—REQUISITES.

Estoppel en pais arises only where the other party has been led to change his position. The mere bringing of the suit in support of which the estoppel is invoked cannot be said to consti-

tute a change of position within the meaning of the law of estoppel.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Estoppel, § 142.]

**6. DAMAGES — CONTRACTS — BREACH — PROSPECTIVE PROFITS.**

The very profits the making of which constituted the sole inducement for entering into the contract cannot be said to be too speculative or remote to be claimed as damages on a breach of the contract. Hence a contractor for getting out timber may recover as damages on a breach of the contract the margin between the contract price and the cost of getting out the timber.

**7. SAME.**

But he can recover nothing more. He cannot recover also and in addition any part of the expenses incurred by him in making preparations or providing a working plant for executing the contract.

**8. SAME—CALCULATION OF FUTURE PROFITS.**

Where large expenses have had to be incurred in preparations for the executing of a contract having five years to run, and after the contract has run two years its further execution is wrongfully stopped, and a suit in damages is instituted for the recovery of the profits that would have been realized if it had been permitted to go on to the end of the five years, the net profits of the first two years cannot serve as a criterion for determining what the ultimate profits would probably have been if the five years had been accomplished.

**9. SAME—EXPENSES OF EXECUTION.**

The salaries of officers and the interest on money invested in the operating plant constitute part of the cost of executing the contract, and must be deducted for arriving at the net profits.

### On Rehearing.

**10. SAME—BURDEN OF PROOF.**

Where a logging contract having five years to run is wrongfully terminated by the contractee at the end of two years, the contractor, who has made no money during the time that the contract was in force, in order to recover prospective profits for the unexpired term of the contract, ought to make it clear that by reason of some change in the conditions he would be able in the future to do that which by actual experience he had been unable to do in the past.

Provosty, J., dissenting.

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by the Des Allemands Lumber Company, Limited, against the Morgan City Timber Company, Limited. From a judgment for defendant, plaintiff appeals. Amended and affirmed.

Howell & Martin, D. Caffrey & Son, and Robert James Perkins, for appellant. Foster, Milling, Godchaux & Sanders and Philip H. Mentz, for appellee.

PROVOSTY, J. Plaintiff is a limited corporation, owner of a sawmill and of swamp lands for supplying its mill with timber. Its officers are R. H. Downman, president, and W. G. Westmoreland, vice president and manager. Defendant also is a limited corporation, and, we may add, was organized for the purpose of entering into the contract out of the alleged violation of which this suit has grown. Its officers are Manuel Coguenhem, president, and G. W. Walker, vice president and swamp manager. Plaintiff, when it entered into this contract was, like defendant, a new concern that had not theretofore operated.

If this opinion is not to rival the proportions of the record of 11 large volumes, containing 4,620 pages, plus one large volume of maps and photographs, and two minor supplemental transcripts, one of them of no mean proportions of itself, nonessentials will have to be passed over in silence. The contract, however, must be given in full, as the case largely turns on its interpretation. It is as follows:

"Witnesseth, that for and in consideration of the covenants and agreements hereinafter made and expressed, to be kept and performed by the party of the second part, the Morgan City Timber Company, Limited, party of the first part, have agreed and covenanted, and by these presents do hereby covenant and agree and contract, to deaden, cut, pull or float, boom, and tow the cypress timber, located and situated in the swamp lands owned, leased, or otherwise held by the party of the second part, located and situated on Bayou Des Allemands, and Grand Lake Des Allemands, in the parishes of St. Charles, St. James, St. John the Baptist, and Lafourche, as shown by the maps of the said lands in possession of the party of the second part, and to which reference is here made, and upon the following terms and con-

ditions: The said party of the first part hereby covenant and agree to pull or float all cypress timber accessible from Bayou Des Allemands and Grand Lake Des Allemands, situated upon said lands, within reach of their pull boat or boats.

"The party of the first part further covenants and agrees to keep one pull boat at work continuously, pulling timber on the said lands hereinbefore described, under the terms and provisions of this contract, except for any and all such unavoidable delays caused by accidents, breakdowns, or other unforeseen causes; and in the event that one pull boat shall not be sufficient to supply the mill of the Des Allemands Lumber Company, Limited, situated on Bayou Des Allemands, in the parish of Lafourche, this state, owned by the party of the second part, with sufficient logs, then and in that event the party of the first part hereby covenants and agrees to increase the number of pull boats to such an extent as may be required to supply said mill with sufficient logs, such additional pull boat or boats to be furnished by said party of the first part upon due notice in writing being given them to that effect by the party of the second part not less than ninety (90) days prior to the time set when such additional boat or boats shall be supplied.

"The Des Allemands Lumber Company, Limited, party of the second part, for and in consideration of the agreements and covenants to be kept and performed by the party of the first part, hereby covenants and agrees to pay unto the party of the first part, or its duly accredited representative or agent, the price and sum of five dollars and fifty cents ($5.50) per thousand feet for all cypress logs measuring eight inches in diameter to fifteen inches in diameter, both measurements inclusive, and the price and sum of five dollars ($5.00) per thousand feet for all cypress logs measuring sixteen inches and above in diameter, delivered at the mill of said Des Allemands Lumber Company, situated on Bayou Des Allemands, in Lafourche parish. All measurements of said cypress logs to be made according to what is known as 'Scribner's Log Rule,' and shall be made at the mill aforesaid upon the delivery of each tow by the party of the first part. Payments to be made for said cypress logs, upon the delivery and measurement of each tow, in cash.

"The party of the second part further covenants and agrees to dredge and construct sufficient canals and pockets for the purpose of pulling said timber, said canals to be constructed in accordance with instructions which shall be furnished by the party of the first part. All such dredging and the construction of such canals and pockets shall be done by the party of the second part at its own exclusive cost and charges. Said party of the second part further covenants and agrees to do all such dredging and make such canals and pockets sufficiently in advance of the time that they are needed by the party of the first part for the use of its pull boat or boats, so as not to delay the continuous working of said pull boat or boats.

"The party of the second part further covenants and agrees to furnish the party of the first part with the use of such chain dogs as may be necessary to deliver said cypress logs, and to permit and allow the party of the first part to take and use such firewood from the lands of the party of the second part, hereinbefore described, as may be necessary for them to run said pull boat or boats free of cost.

"The party of the second part further covenants and agrees to take all the cypress timber that the pull boat or pull boats of the party of the first part can pull, or that shall be floated, for a period of five years or more.

"The party of the second part further covenants and agrees to put the party of the first part on the lands hereinbefore described and to designate to it or its representatives the boundaries thereof, and should any surveying be necessary to be done, or lines run or established, all such work is to be done by the party of the second part at its own expenses.

"It is mutually covenanted and agreed by and between the parties hereto that this contract shall become effective in ten days from the date of the signing hereof.

"In witness whereof," etc.

The foregoing contract was drafted in the absence of Mr. Downman. It was left open for suggestions from him. He requested that some changes should be made, and accordingly eight days thereafter, on June 14th, the parties met at Bowie, and, after conference executed the following instrument:

"That for and in consideration of the covenants and agreements contained in the contract hereinbefore entered into between the parties hereto on the sixth day of June, 1901, the party of the first part hereby covenant and contract to deaden, cut, pull or float, boom, and tow all the cypress timber located and situated on the swamp lands owned, leased, or otherwise held, or which may be hereafter acquired, by the party of the second part, located and situated on Lake Des Allemands, Bayou Des Allemands, and Lake Salvator, and such bayou or bayous tributary thereto as may be designated by the party of the second part.

"The parties hereto further mutually covenant and agree that all canals to be dug and constructed under the contract herebefore referred to shall be dug and constructed according to the plans as suggested by the party of the second part, provided that such canals and pockets shall be dug and constructed so as to assist and aid the party of the first part to carry out the provisions of the contract referred to herein.

"It is further mutually covenanted and agreed that the measurements of timber are to be made on the full length of the log, and

that the diameter is to be taken at the small end.

"The parties hereto further mutually agree that the covenants and agreements herein contained shall be made and constitute a part of the contract heretofore entered into by them on the 6th of June, 1901, and to which this agreement is attached; it being the mutual intent of the parties hereto that, so far as said contract may be amended and changed by the stipulations and covenants herein, this agreement shall govern, but that otherwise the said contract shall remain in full force and effect.

"And R. H. Downman, president and representative herein, of the party of the second part, herein joins and makes himself a party hereto, in person, for the purpose of affirming and ratifying the said contract as the president of the Des Allemands Lumber Company, Limited, and for himself in person.

"In witness whereof," etc.

It may be well to explain the meaning of the terms to "deaden" and to "pull." To "deaden" timber means to circle the tree with a cut deep enough to interrupt the flow of the sap and thereby kill the tree. To "pull" timber means to drag it from where it has been felled to the water on which it is to be floated to the sawmill. This is done by means of a wire rope capable of reaching out as far as 5,000 feet, operated from a boat called a "pull boat." For the floating of this boat and of the timber it "pulls" a canal is dug, with an enlargement at every 120 feet, called a "pocket," for the accommodation of the boat.

The defendant company proceeded at once to provide itself with an outfit and to organize labor for carrying out the contract. This outfit consisted at the time of the institution of this suit, of the following:

| | |
|---|---:|
| Pull boat No. 1 cost, including machinery and wire | $7,625 51 |
| Pull boat No. 2 cost, including machinery and wire | 4,026 85 |
| Pull boat No. 3 cost, including machinery and wire | 3,785 92 |
| | $15,438 28 |
| The two-story camp boat cost | $1,661 71 |
| A barge cost | 400 00 |
| Another barge cost | 303 00 |
| A pile driver cost | 250 00 |
| | $2,614 71 |

| | |
|---|---:|
| Three camps on land cost | $ 400 00 |
| Two small wooden barges cost | 150 00 |
| Large camp boat on land | 200 00 |
| Camp boat on barge | 160 00 |
| Steamer Richmond cost | 1,450 00 |
| Dugouts, tools, etc | 500 00 |
| | $2,860 00 |
| Total foregoing | $20,912 99 |
| Add 110 cords wood on hand April 25th at $2.50 | 275 00 |
| | $21,187 99 |

Also one pile boom, cost not stated. The above estimates of cost are by defendant's witnesses.

The first tract of land designated to defendant for it to operate upon was Pointe Cypre, alias Island No. 1; the next was Pointe Folse, alias Island No. 2, lying just back of Pointe Cypre, or Island No. 1; and the next was a small island known as "Island No. 3." Next was a swamp known as "Paradis Swamp," lying on the other side of Lake Des Allemands.

Whether for "pulling" or for "floating" the timber has to be deadened a few months beforehand. This part of the work occupied defendant until August, so that defendant began pulling only in the latter part of August, and the first tow or raft was not delivered until September. It and the succeeding deliveries were duly measured. They were not, however, settled for; the parties not agreeing as to the mode of settlement. Walker, vice president and swamp manager of defendant, testifies that plaintiff wanted the contents of the logs computed by the Doyle rule, whereas he insisted upon Scribner's rule as being the rule stipulated in the contract; that under the one rule a log 24 feet long and 8 inches in diameter would give 24 feet of timber, whereas under the other rule it would give 37 feet.

On January 8, 1902, for the settlement of this dispute, an addendum was made to the contract. The price was increased and the Doyle rule of measurement adopted. Difficulty next arose over the manner of the measure-

ment. Westmoreland, for plaintiff, sought to make the computation by establishing certain averages. But in this its own attorney ruled against it, and it yielded.

Thereafter the contract continued to be executed, but with more or less friction and mutual complaints.

Plaintiff's main heads of complaint were that defendant would not bring out the trees their full length, but would cut them up into several pieces, thereby largely increasing the measurements; that the mill was not supplied regularly, but had to shut down occasionally for want of logs; finally, that defendant did not take good care of the rafting materials, which under the contract plaintiff was bound to furnish. Defendant's main heads of complaint were that plaintiff did not furnish a sufficiency of rafting materials; that the first canal was not deep enough, and had a sharp bend, so that the pull boats could not be operated advantageously, and the trees had to be brought out one at a time, instead of by rafts; that the second canal, the one in the Paradis swamp, was not ready in time, and was not deep enough, so that the pull boats were idle for a considerable time, and could not operate advantageously when they did operate.

In the latter part of 1902 plaintiff sought to control defendant in the matter of the location of the pull boats, and sought to require defendant to operate by the so-called "fantail" method; and all this gave rise to further friction.

The situation becoming somewhat strained, a conference was called for by plaintiff. It was held in the office of Mr. Downman, president of plaintiff company, in New Orleans. What took place at this conference will be referred to later. It resulted in nothing, and the parties continued under the existing contract.

This was the situation when in April, 1903, a break occurring in the levee along the Mississippi river, at Hymelia in the parish of St. Charles, the swamp was flooded, and it became possible for defendant to execute the contract by "floating," instead of by "pulling"; that is to say, to float the timber from the stump to the mill, instead of having to first "pull" it to water, as had been done theretofore.

At the time of entering into the contract the extreme probability had been that all the timber would have to be brought out by the pulling process. Still the contingency of a break in the public levees, and of a consequent high stage of water in the swamp, such as would make it possible to float the timber from the stump to the mill, dispensing with pulling, had been contemplated by the parties, and the alternative "or float" had been inserted in the contract in view of that contingency. All the same, the "float" came somewhat as a surprise, and plaintiff thought a conference should be had for considering how defendant should operate under the new conditions. Accordingly, on March 31, 1903, the parties met in the office of the plaintiff company at Des Allemands. There were present Westmoreland, vice president and business manager of plaintiff; Dallas, vice president and manager of Iberia Lumber Company, of which Downman, president of plaintiff company, is president; Elfer, swamp agent of plaintiff; Leonard, another swamp agent of plaintiff; Coguenhem, president of defendant; and Mayer, defendant's agent at plaintiff's mill. Hubert, book keeper of plaintiff, heard a part of the conversation. As to what was the exact understanding arrived at, the parties differ widely. Plaintiff contends that it was that during the float defendant should cut the trees at the deadening circle and should take the timber on the back part of the Paradis swamp and abstain from taking that on the front part, the part rendered accessible to the pull boats by the canal, and called in this case the "pull-boat

territory." Defendant contends that the understanding went no further than that defendant engaged that it would proceed in the usual and customary manner. Whatever was the understanding at this conference, defendant went on with the execution of the contract, and plaintiff continued to send its agent in the swamp and keep a sharp eye on defendant's operations. On the 9th of April the water had reached a stage for floating. On the 15th, the first floated timber was delivered. It gave occasion to a telegram and a letter from plaintiff to defendant.

"We have just wired you the following: 'Will not accept any more timber from small islands floated by Como. Trees cut in direct violation of contract. Work must stop immediately there. We will not have our timber butchered'—which we now beg to confirm. We have just finished measuring a lot of trees, 295, which have just been brought from the small islands and have been floated by Como; and we find that they have been butchered and cut up, and in hardly one case has the tree been delivered in accordance with the contract; and we will not receive any more timber as per our telegram; and we must request that you instantly instruct your foreman, Mr. Mayer, at this point, to issue instructions to have work cease there immediately; otherwise, we will hold you for all damages occasioned by same. As it is, any loss that we have incurred, after examination, we will expect you to stand. We remain," etc.

On the same day, the 15th of April, plaintiff wrote to defendant, complaining of the scarcity of logs at the mill and demanding a more active delivery.

Three days thereafter, on the 18th, plaintiff again wrote defendant. The letter is long and deals with details. In it any further grounds of complaint plaintiff might have had on the score of the cutting up of the timber would presumably have found place, but no complaint is made. However, defendant had not, it seems, as yet answered satisfactorily the complaint theretofore made in connection with the delivery of the 15th, and its attention was called to the matter in the following words:

"We must request you to send us an immediate answer to our letter of the 15th inst.

While we received one saying that you would investigate the complaint, we consider you have had ample time to do so. We do not propose to let this matter run for any length of time, and therefore must insist upon an immediate answer before we take any action in the matter."

During this time the execution of the contract went on. Deliveries of timber were received and measured by plaintiff, without complaint, on the 17th, 20th, 22d, 24th, and 25th of April; that is to say, down to the day itself of the filing of the suit, which was on April 25th. It is furthermore noteworthy that the delivery of the 24th came from the same part of the swamp, Islands Nos. 2 and 3, from which had come the delivery of the 15th that had occasioned the letter of complaint of that date; and all the while the swamp agents of the plaintiff, Elfer and Leonard, had kept watch over the work of defendant in the swamp, and presumably had kept plaintiff fully advised of what was going on.

On the 19th of April, which was a Sunday, the same two swamp agents spent the day in the Paradis swamp, where defendant was operating. The next day, Monday, they made their report to the plaintiff in New Orleans. On their report this suit was decided on. It was filed on the 25th of April, without any putting in default or other warning to defendant.

The petition, after reciting the contract, proceeds as follows:

"Now your petitioner avers that the object and purpose of entering into the contract was to furnish a continuous and unfailing supply of sawlogs for its mill and to insure for the use of the mill all logs of a size profitable to saw into lumber, the purpose and intent being to clear the land of all such timber; it being agreed and stipulated that all trees which would furnish a log eight inches in diameter at the small end—such diameter being by subsequent oral agreement reduced to six inches at small end of log—were to be removed from the land controlled by your petitioner and delivered to its sawmill, as the whole will more fully appear by the triplicate original copy of the said contract and amendments hereto annexed and made part hereof.

"Petitioner avers that the price covenanted to be paid by your petitioner to the said Morgan City Timber Company, Limited, is under the circumstances a high price; but your petitioner was induced to pay the same because he believed, and was induced by the Morgan City Timber Company, Limited, to believe, that it was contracting with a thoroughly responsible party, and would be insured a strict and faithful compliance with the terms of the contract, and guarantied a full and constant supply of sawlogs for its mill and a perfect clearing of its lands of all timber.

"Petitioner avers that, in spite of the fact that it faithfully and honestly complied with all of its obligations and undertakings as stipulated in the said contract, the said Morgan City Timber Company, Limited, has almost from the very beginning of the contract flagrantly and actively violated the said contract both in letter and spirit, and has caused and is still causing serious loss and damage to your petitioner.

"That within the past three weeks, in spite of the positive instructions of your petitioner given in accord with the terms of the said contract; and in spite of the positive promise of the said Morgan City Timber Company, Limited, to carry out the instructions of your petitioner, and over and contrary to the earnest protest of your petitioners, the said Morgan City Timber Company, Limited, has cut and floated timber from places on petitioner's lands not designated by it, and refused to cut and float from places designated by it in accordance with the terms of the said contract, and as agreed and promised by the Morgan City Timber Company, Limited.

"That it has cut down, and is continuing to do so, trees about the circle of dead line mark in spite of its positive promise not to do so, and in direct violation of that contract, thereby causing a very large loss of timber to your petitioner.

"That it has cut, and is continuing to cut, the timber so low down from the top of the tree as to cause a very large loss of timber to your petitioner, and in direct, positive, and active violation of the said contract, construed both according to its letter and spirit, and according to the customs of cutting timber in the swamps and as heretofore done by defendant anterior to the high water. That it has delivered, and is continuing to do so, pieces of logs, instead of the whole logs, according to contract, and is blocking with branches and débris the canal and pockets cut by your petitioner to pull, raft, and tow in accord with said contract during the time when the swamps are not overflowed by high water from crevasses on the Mississippi river as now, thus choking up and rendering such canals and pockets practically useless for the purpose for which they were intended, and inflicting serious loss and damage upon your petitioner.

"That by the methods of cutting, trailing, and floating timber from the lands of your petitioner now being pursued by the said Morgan City Timber Company, Limited, and in direct violation of its obligations under the contract, and of its repeated promises, your petitioner's swamps and timber lands are being ruined, as they are being merely culled of best and most available timber by the Morgan City Timber Company, Limited, and not cleared of all marketable logs of dimensions stipulated and as intended by the terms of the contract; and in addition thereto the canals and pockets cut by your petitioner as aforesaid for the purpose of pulling, rafting, and floating timber when the swamps are free from high water are being choked up and practically ruined, and will be rendered perfectly useless, unless the said Morgan City Timber Company, Limited, is prevented from continuing its illegal and wasteful acts, and your petitioner will be forced, when the high water leaves the swamps, to dig new canals and pockets to pull, raft, and float its timber, at a very heavy expense.

"Petitioner avers that the said Morgan City Timber Company, Limited, has already inflicted damages upon your petitioner to an amount exceeding five thousand dollars ($5,000.00), and, if permitted to continue its present illegal, wanton, and wasteful methods, will in a very short time ruin the swamps of your petitioner and render them utterly useless for the purpose intended.

"That the amount of timber as left on the lands now being cut and floated by the Morgan City Timber Company, Limited, will be very large and of such lengths and sizes as to render it perfectly useless for the purpose for which it was intended, and if said company is permitted to continue will utterly ruin petitioner's swamps and inflict irreparable injury upon your petitioner.

"That by the aforesaid wanton and illegal acts the defendant has lost all rights under the contract and becomes a mere spoliator of petitioner's property.

"Petitioner avers that by the continued and persistent violation of the Morgan City Timber Company, Limited, of the said contract it has forfeited all its rights thereunder, and your petitioner is entitled to have the same canceled, annulled, and set aside."

The prayer is for the annulment of the contract, and for an injunction against further operations under same, and for $5,000 damages.

The answer, after a general denial and an admission of the contract, proceeds in substance as follows:

"That defendant made preparations to carry out the contract, investing large sums in the said preparations; that from about January 1, 1902, plaintiff put obstacles in the way of the performance of the contract, and acted in such a manner as to try to force defendant to violate said contract, or to default thereon.

"That in order to settle these differences, and prevent the plaintiff from harassing defendant further with reference to said contract, defendant entered into the supplementary contract of January 8th, 1902.

"That plaintiff was still dissatisfied, and continued to worry the defendant by seeking further changes in the contract.

"That failing to secure further alterations of the contract, and failing to make defendant default thereon, and failing to force defendant into a lawsuit to protect its rights, plaintiff resorted to the injunction herein; that it did so, not for the purpose of protecting a right or preventing an injury, but for the purpose of preventing defendant from making and of itself making the profits that were to be made on the float that was then on.

"That immediately upon the issuance of the injunction plaintiff took charge of the swamps, and even of the camps of the defendant, demoralized its entire force of labor, hired them for its own account, and put the defendant in a position where the further carrying out of the contract became absolutely impossible. * * *

"That therefore said injunction was wanton and malicious; finally that it had damaged defendant in the sum of $193,826.68."

The answer further alleged that R. H. Downman was responsible personally on the contract, and should be cited on the reconventional demand. The items going to make up the $193,826.68 are given in detail.

The prayer was for the annulment of the contract, in so far as it bound defendant, and for the dissolution of the injunction, and for judgment against the plaintiff company and R. H. Downman, in solido, for $193,826.68, with interest, and with recognition of privilege upon certain timber, and for judgment against the sureties on the injunction bond to the extent of their liability.

Over the objection of plaintiff, an amended answer was filed.

Plaintiff urges that the amendment changes the issues, and should not have been allowed. We do not find that it changes the issues. The only issues between the parties are as to whether the contract as written, or as amended by the verbal agreement alleged by plaintiff, has, or not, been violated; whether plaintiff, in bringing this suit, has, or not, acted in bad faith; lastly, whether either party owes the damages mutually

claimed. The supplemental answer adds nothing to these issues. It only makes more specific the allegations of wrongful conduct on the part of plaintiff; hence it does not change the issues, and was properly allowed. Bad faith, it is true, is not alleged in the original answer in express terms, but it is alleged by necessary implication, which amounts to the same thing.

The case was tried by a jury. It resulted in a verdict annulling the contract, dissolving the injunction, and condemning plaintiff to pay $45,000 damages. Plaintiff has appealed, and defendant has answered the appeal, asking that the damages be increased to the full amount claimed in the answer.

Plaintiff has moved to strike out this answer, on the ground that it was filed too late. The Code requires the answer to be filed at least three days before the day fixed for argument. The case was fixed for the 17th, and the answer was filed on the 14th; hence, under the rule, too late. But on the 10th the parties had agreed that the case should be reassigned for the following month. This, as between the parties, had the effect of setting at naught the assignment for the 17th. What would have been the situation, had the court refused to sanction this agreement and to reassign the case in pursuance thereof, is a question unnecessary to be considered, since, as a matter of fact, the agreement was sanctioned by the court and had full effect. We conclude that the answer was filed in time.

The trial below was conducted sharply, and, we may add, in a masterly manner; and no enlargement of pleadings has been permitted to be brought about by the admission of irrelevant evidence without objection.

The allegation in the petition that the defendant violated the contract "almost from the very beginning" is too vague and general to be considered as adding anything to the petition; and we do not understand it to be

relied on as an additional ground of action. Therefore the sole grounds having to be considered in this opinion are those that are specified, namely:

(1) That defendant cut and floated timber from places not designated, and refused to cut and float from places designated; or, more specifically, that during the float the defendant, contrary to plaintiff's instructions and contrary to its own agreement and promise, took the timber in that part of the Paradis swamp made accessible to the pull boats by the canal, the so-called pull-boat territory, instead of taking the timber from the back part of the area of deadened timber in said swamp.

(2) That defendant cut the trees above the deadening circle.

(3) That defendant cut the trees too low down from the top.

(4) That defendant delivered pieces of logs, instead of whole logs; that is to say, cut the tree into several pieces, instead of delivering it in one piece.

(5) That defendant was blocking with branches and débris the canals and pockets which had been dug for the purpose of pulling the timber.

(6) That defendant was merely culling the swamp, instead of removing all the marketable timber; that is to say, was not taking out the timber of less than eight inches diameter, and was not taking all timber of six inches diameter and up.

(7) That as the result of defendant's operations plaintiff's swamp was being ruined, and plaintiff's canals were being choked up; that is to say, that the timber below eight inches and the timber left in the stumps and in the tops would be lost to plaintiff, and the swamp was being so blocked up that it would be impossible to get out what timber would be left in it.

It will be observed that the acts complained of are alleged to have occurred "within the past three weeks"; that is to say, during the flood, or float—in other words, after defendant had ceased to operate by the pulling process and had begun to operate by the floating process. Plaintiff not only is not relying, as a ground of action, upon any breach of the contract that might have occurred previous to the float, but could not do so. Any right it might have had in that connection it had waived by going on with the contract and insisting upon a performance of it by defendant.

Naturally one cannot claim the benefits of a contract, insisting upon its performance, and at the same time ask its dissolution. When a breach occurs, an election must be made then and there between asking for a dissolution and insisting upon further performance, and the choice is made once for all. Upton v. Adeline Co., 109 La. 674, 33 South. 725; 29 A. & E. E. of L. pp. 1103, 1106; 24 A. & E. E. of L. p. 625; 20 A. & E. E. of L. p. 33.

Defendant admits that it went counter to plaintiff's wishes in the matter of cutting timber in the front part of the Paradis swamp, instead of in the back part; admits that it cut the timber above the deadening circle; admits that it did not bring the trees out all in one piece. Its contention is that on all these points the contract is silent, leaving matters to be regulated by custom and usage and that it conformed strictly to custom and usage; that, under the contract, the right of plaintiff to designate the place where defendant should operate went no further than to designate the tract of land to be cleared, and did not extend to controlling defendant in regard to where to begin and where to end, or in what order to proceed, upon the tract of land after the same should have been designated for clearing; that the contract contains no express provision regarding the cutting of the tree, or the form in which the timber should be brought out. On all the

other points, defendant challenges the assertions of plaintiff in toto.

We now proceed to discuss, each by itself, the several grounds of the injunction.

### Blocking Canals with Débris.

This ground is practically abandoned, and may be disposed of summarily. Plaintiff made no attempt to substantiate it. Indeed, the proof is all one way, and part of it consists of· photographs of the canal. Elfer and Leonard, the two swamp agents on whose report plaintiff brought the suit, state that they gave no such information. Leonard says that it is not a fact; that so far as he knows "the canals were open and all right." The statement of plaintiff that the court ruled out evidence on this point is not supported by the record. The court did not rule out any evidence tending to show a violation of the contract. The ruling in question related to proof of damages, and was to the effect that the allegation of damages was too vague and general to authorize the introduction of evidence.

### Culling the Swamp.

Plaintiff's contention under this head is that at the meeting at Bowie, when the contract was amended and finally adopted the diameter of the trees to be taken was reduced to six inches, and all timber below eight inches diameter was to be measured and paid for as of eight inches. Defendant denies that any such verbal agreement was entered into. Westmoreland and Downman testify that it was, and Coguenhem and Walker deny it. The fifth person at the meeting, Wise, the attorney and notary who drew up the writing evidencing the result of the meeting, a wholly disinterested witness, testifies that the writing embodied all that was agreed to. This is conclusive; especially that the writing contains a clause reaffirming the original draft of the contract, except in so far as expressly modified. Beyond this there is the

testimony to Nuttall, a disinterested and highly competent witness, to the effect that not for $8 a thousand would he handle six-inch timber, even if measured as eight-inch timber; that it costs more than that. If this be true, how improbable it is that two experienced timber men, like Coguehem and Walker, who represented defendant at this conference, would have consented to handle this class of timber for the $5.50 named in the contract.

As to whether, up to the coming of the flood, the six-inch timber had been taken out, the evidence is conflicting. On the one hand, there is the positive testimony of Westmoreland that it was, and there are his letters of September 23, 1902, and March 21, 1903, complaining of certain small timber not being taken, and also a letter of defendant of March 26, 1903, in reply, saying that the complaint of "some small trees being left behind" was noted and would have attention. On the other hand, there is the positive testimony of Walker that never at any time during the execution of the contract defendant made the slightest pretense at taking out the timber below eight inches. And there is also testimony of one of the subcontractors to the effect that defendant's positive instruction to him was to deaden nothing under eight inches, and that defendant refused to pay him for 165 trees which he had deadened below that diameter. Furthermore, there is evidence going to show that, at the time of the flood, trees of that size were still standing at a place which before the flood defendant had cleared to the satisfaction of plaintiff's agents. On the subject of this standing timber, however, plaintiff's evidence was ruled out, and hence on that point the condition of the record is unsatisfactory.

Whether the "small trees" referred to in the letters of plaintiff were six or eight inch timber cannot be known positively from the record. The inference would be that they

were eight-inch timber, since that was the smallest called for by the contract.

It is noteworthy that at the conference of 28th of January, 1903, to which extensive reference shall be made hereafter, the minimum was sought to be reduced to six inches, and that defendant refused to consent to the change.

### Trees Cut Too Low from Top.

Another point on which the decided preponderance of the testimony lies on the side of defendant is that of the topping of the trees. The witnesses who testify for plaintiff touching the leaving of good timber in the tops of the trees were Westmoreland, vice president and manager of the plaintiff company (no practical knowledge of swamping); Downman, president of plaintiff company (no practical knowledge of swamping); Elfer, plaintiff's swamp agent, or inspector; Dallas (experienced in swamping business), vice president of the Iberia Cypress Company, whereof Downman, president of plaintiff company, is president; Leonard, plaintiff's swamp inspector; Thorgenson (experienced swamper), unfriendly to Coguenhem, president to defendant company; Kelso (swamper); and Gutekunst, surveyor and timber estimator (in the regular employ of plaintiff).

Forgay, Angelo, and Hanson, experienced swampers, examined the swamp together at the request of plaintiff and were piloted around by Elfer and Leonard, plaintiff's swamp agents. Forgay was called to the stand by plaintiff, but was not examined as to the condition of the swamp, or as to the topping of the trees. Angelo and Hanson made a report disappointing to plaintiff, and were not called by plaintiff, but were called by defendant. The other witnesses who testified for defendant were defendant's swamp manager, Walker, and the following persons who had been taken into the swamp by defendant as experts to examine it with a view to testify-ing: O'Brien (has engaged in various occupations, now a planter, not connected with parties to the suit, no practical knowledge of swamping); Vincent (owner of pull boats, experienced swamper, not connected with parties to suit); Constant (swamper, subcontractor of defendant); Cotten (swamper, not connected with parties to suit); Bateman (occupation not stated, but not qualified as expert, not connected with parties to suit); Drew (owner of sawmill and experienced swamper, also president of bank, not connected with parties to suit); Nuttall (engineer and timber estimator for F. B. Williams & Co.); Walker (swamper, father of defendant's swamp manager); Sanders (sheriff of St. Mary parish, experienced in swamping.)

It may be said, in general terms, that plaintiff's witnesses found that a considerable precentage of good timber had been left in the treetops, and that those of defendant found that none had been left. The testimony of Angelo and Hanson, who went into the swamp at plaintiff's request and accompanied by plaintiff's swamp agents, and who are totally disinterested parties, is of itself decisive. That plaintiff did not question Forgay is also very significant, especially from the fact that Forgay is in the employ of Downman, president of the plaintiff company. Another very significant circumstance is that during the float plaintiff made no complaint to defendant touching the manner in which the trees were being topped. The testimony of Nuttall, timber estimator for F. B. Williams & Co., is to the effect that, if he had had to report on the swamp, he would have reported "the swamp was perfectly cleaned of all valuable timber." This testimony, coming from a witness so highly competent and free from any disturbing influence, is considered to be particularly strong.

### Full Length of the Tree.

The original contract contains the following clause:

"All measurements of said cypress logs to be made according to what is known as 'Scribner's Log Rule.'"

Scribner's Log Rule, here thus adopted by reference, requires that a diameter be taken at each end of the log and the sum of the two diameters be divided by two for finding the true diameter.

The amended contract contains the following clause:

"It is further mutually covenanted and agreed that the measurements of timber are to be made on the full length of the log, and that the diameter is to be taken at the small end."

Defendant contends that this is nothing more than an amendment of the above measurement clause of the original contract, and means nothing more than that only one diameter is to be taken and that at the small end.

Plaintiff contends that it means this, and that it in addition means that the tree is to be brought out of the swamp and delivered its full length; in other words, that only one log is to be made out of each tree. No one, argues plaintiff, would ever think of measuring the log at less than its full length; hence, if this clause is construed as referring to the full length of the log, and not of the tree, it is rendered meaningless, or absurd.

We adopt defendant's view. The original contract says absolutely nothing touching the form in which the timber should be brought out; that is to say, whether the tree should be brought out in one piece, or might be cut into two or more logs. The matter was left to be governed by custom and usage. It is an entirely different and separate matter from the mere measurement of the delivered timber or computation of the contents of the log. The clause quoted above from the original contract made provision for this measurement, and for that exclusively, and had absolutely nothing to do with the form in which the tree should be brought out,

whether in one or in several logs. It is so improbable as to be almost incredible that if, instead of leaving to custom and usage this matter of the form in which the timber should be brought out, the parties had intended to amend the original contract so as to embody a special agreement on the subject, they would not have expressed themselves explicitly—would not have said, for example, that the tree should be brought out its full length, or in one piece, or that only one log should be made out of each tree—but that they would have contented themselves with speaking of the manner of measuring the delivered timber, or log; in other words, would have contented themselves with prescribing the manner in which the delivered timber should be measured, instead of prescribing the manner or form in which the timber should be brought out.

It is also exceedingly improbable that Coguenhem and Walker, who represented defendant in the making of this contract, two experienced timber men, would have subscribed to an agreement to bring the tree out its full length without qualifying the agreement so as to provide for the cases where it would not be possible to bring the tree out its full length. The evidence shows that the tree sometimes gets caught, or wedged, or "jacked," as it is called, and cannot be gotten out without being cut into two or more pieces. Leonard, plaintiff's witness, says that no timber man of experience would subscribe to an unqualified agreement to bring the tree out its full length. And yet this clause is an agreement of that kind, if plaintiff's interpretation is correct. We cannot but think that, if the parties had intended this clause to be an agreement to bring the tree out its full length, they would have qualified it.

In order to make the clause have reference to the tree, plaintiff has to contend that "log" means "tree." But everybody

konws differently. We find Westmoreland himself, in his letter of August 1, 1902, making a sharp distinction between the two words. He says:

"The practice you are adopting of cutting our timber into log lengths in the swamp must cease at once."

Plaintiff contends that from the very beginning of the execution of the contract, and all along, defendant admitted its obligation to bring the trees out their full length. There can be no doubt that plaintiff insisted upon its right to have the trees brought out their full length. Letters of January 10, May 20, and August 1, 1902; testimony of Westmoreland, Downman, and Elfer. Defendant's answers to the letters are not in the record, but the witnesses just named say that to any and all remonstrances made on the subject of the undue cutting up of the trees defendant's agents would invariably answer that they would see that the trees were not cut up more than was necessary. Walker, defendant's agent, testifies that the matter was frequently discussed; plaintiff contending that they had the right to have the logs delivered the full length of the tree, and he contending that it was not so —that they could not show any such clause in the contract. We do not think that defendant's tacit, or even express, admission of its obligation not to cut up the trees unnecessarily, would amount to an acknowledgment that the contract contained an express clause on that subject. Non constat that custom and usage would not require that much. It would seem to go almost as a matter of course that a contractor for getting out timber could not be permitted, even in the absence of any special stipulation on the subject, to cut up the trees unnecessarily, and that any protest against the unnecessary cutting up of the trees would naturally be met by him with the answer that if anything of the kind was being done the matter would be seen to. Defendant may

well have denied that the contract contained any cast-iron clause on the subject, and yet contended that even without such a clause the trees could not be cut up more than usual or customary, or, in other words, necessary. The custom in pulling timber is to bring out the tree in its full length whenever practicable. It is cheaper to do so, as a good deal of work must be bestowed upon each piece preparatory to pulling it. We do not remember that any witness says that any trunk was cut after it had been pulled or brought to water.

Plaintiff's learned counsel argue cogently that the difference between the average contents of the logs as brought out before the float and as brought out during the float —658 feet and 307 feet, respectively—shows that during the float the trees were being unnecessarily cut up. The difference between these averages is in part explained by the fact that the timber that was brought out, during the float from one of the swamps, the Paradis swamp, had been felled for pulling, and was so crossed and piled up one on another that defendant had to cut it a great deal in order to float it out. It is not denied that defendant had the right to float it out. Some allowance, also, has to be made for the fact that at the beginning of the float, and until the water got deep, the floating was confined to the smaller trees. It is, moreover, shown that timber is usually cut shorter for floating than for pulling; also the stumps had to be cut somewhat higher. Walker testifies that when plaintiff's letter of complaint was received he went to Islands 2 and 3 to investigate, and found that the brake was very thick and that the trees had had to be cut up a great deal in order to get them out.

Our conclusion is that, in the absence of any contract obligation to bring out the timber in any particular form, defendant was not bound to do more than was required

by custom and usage, and that the evidence does not show that defendant did not conform to custom and usage. The average length of the timber was 32.04, and this is shown to be a fair average. In the tow No. 81, of the 15th of April, with reference to which plaintiff made complaint, the shortest log was 14 feet; and there were only three of that length out of a total of 675; the others being of 16 feet and up. A significant circumstance is that the timber floated by defendant compares favorably in point of length with that floated by plaintiff itself after the injunction.

After the one complaint of April 15th, plaintiff received timber on the 17th, 20th, 22d, 24th, and 25th without complaint; and it is also noteworthy that the two swamp agents, Elfer and Leonard, cannot remember whether this question of the cutting up of the tree was mentioned at all in their report of the 20th of April, on the strength of which the suit was brought. They incline to think it was not mentioned. This is significant, in view of the fact that the report, and the conversation attending it, bore upon the supposed violation of the contract. The two inspectors remember to have referred only to the two points of the cutting above the deadening circle and the taking of timber on the pull-boat territory.

### Cutting on Pull-Boat Territory, or Right to Designate—Amended Contract.

At the conference of March 31st, in the office of the plaintiff company at Des Allemands—the conference held for the purpose of considering how defendant should operate during the float—plaintiff requested or instructed defendant to abstain from floating the timber from the so-called pull-boat territory; that is to say, from that part of the Paradis swamp made accessible to the pull boats by the canal, but to float the timber from the back part of the deadened area of timber. Plaintiff claims that it had the right, under the terms of the contract, to give this instruction to defendant, and that defendant, at this conference, admitted it. Defendant joins issue on both assertions. With the conference we shall deal later on, under a separate head. We shall confine ourselves under this head to considering what, apart from the admissions which defendant might have made at the conference, would be the proper interpretation of the contract, with reference to the right claimed by plaintiff to direct or control the course of defendant upon the land, after the same had been designated to defendant for operations under the contract.

The clause of the contract relied upon by plaintiff for claiming this right is the following:

"The party of the first part hereby covenants and contracts to deaden, cut, pull or float, boom, and tow the cypress timber located and situated on the swamp lands owned, leased, or otherwise held, or which may be hereafter acquired, by the party of the second part, located and situated on Lake Des Allemands, Bayou Des Allemands, and Lake Salvator, and such bayou or bayous tributary thereto, as may be designated by the party of the second part."

Plaintiff contends that under this claim defendant was bound to pull or float the timber "as may be designated by the party of the second part"; in other words, was bound to follow the "designations" or instructions of plaintiff, not only with reference to the tracts of land to take timber on, but likewise with reference to what part of the land to operate on first.

Defendant's contention is that this clause relates exclusively to the identification of the tracts of land which were to be considered as embraced in the contract; that such a provision for the identification of the several tracts of land embraced in the contract was necessary, because these lands were not identified by the contract, but were merely vaguely referred to as being situated on the lakes and bayous named; that plaintiff was to identify them by designating them, and was

even to have their lines surveyed, if necessary; that this clause, as found in the amended contract, was designed to subserve the same purpose, and have precisely the same scope, as the following clauses of the original contract, to wit:

"The Morgan City Timber Company, Limited, party of the first part, have agreed and covenanted, and by these presents do hereby covenant and agree and contract, to deaden, cut, pull or float, boom, and tow all the cypress timber located and situated in the swamp lands owned, leased, or otherwise held by the party of the second part, located and situated on Bayou Des Allemands and Grand Lake Des Allemands, in the parishes of St. Charles, St. James, St. John the Baptist, and Lafourche, as shown by the maps of said lands in possession of the party of the second part and to which reference is here made."

"The party of the second part further covenants and agrees to put the party of the first part on the lands hereinbefore described and to designate to it or its representatives the boundaries thereof, and, should any surveying be necessary to be done, or lines run or established, all such work to be done by the party of the second part at its own expense."

Under the contract, continues defendant, after a tract of land had been designated for the timber on it to be taken, defendant was left free to begin upon what part of the land it deemed best, without being hampered or interfered with by any instructions or control from plaintiff.

The first time plaintiff sought to exercise the right to control the movements or operations of defendant—that is to say, to go beyond merely designating or identifying the tract of land for defendant to take the timber from—was in January, 1903, a few months before the coming on of the float, which was in April. The circumstances were these: Plaintiff was not ready with the canal in the Paradis swamp, and, in order not to be placed in default in its obligation to furnish canals for defendant to operate in, sought to require defendant to locate its pull boats elsewhere. Plaintiff first "advised" and "suggested" that defendant do so; then it changed its tone to "wishes" and "instructions." Defendant paying no atten-

tion to the instructions, plaintiff spoke of "violation of contract." (Letter of January 20, 1903.)

Defendant at once demurred, saying:

"We did not then recognize your right to interfere with our work, and do not now." (Letter of January 22d, 1903.)

At this time, also, plaintiff sought to require defendant to operate the pull boats by the process known as "fantail," which differs from the ordinary process in that, instead of pulling at right angles with the canal, by means of numerous small pockets at short intervals along the canal, in such way that the territory covered from each pocket has the shape of a parallelogram, the pull boat operates at varying angles from one large pocket, and the territory covered has the shape of an open fan. This mode of operation seems to be unusual, and not practical in a swamp like the Paradis swamp in which plaintiff wanted to have the defendant adopt it. Defendant again objected, claiming that it was not bound under the contract to use this process, and that plaintiff had to furnish the usual and ordinary canals and pockets.

All this led to the holding of another conference. It took place on January 28, 1903, in the office of Mr. Downman, in New Orleans. At this conference Mr. Westmoreland began reading the letters which he had written defendant touching the location of the pull boats, and thereupon Mr. Mentz, the attorney of defendant, asked him whether he was able to point to any clause of the contract which gave him the right thus claimed to direct and control the operations of defendant. And Westmoreland was unable to answer.

It did not occur to Westmoreland to invoke the clause now being invoked, and to our mind it is perfectly plain that the clause has reference exclusively to the identification of the several tracts of land that were to be considered as embraced in the contract, and

was never intended to bear the interpretation plaintiff is now contending for.

At this conference the fantail process was discussed. Plaintiff insisted that this fantail process was practical, and that defendant was bound under the contract to use it. No conclusion was arrived at. The conference wound up by a suggestion from Mr. Downman that the attorneys should draw up a contract under which the parties might get along smoothly.

On the trial plaintiff objected to all proof of what took place at this conference, on the ground that everything that was there said was in the nature of proposals of compromise. Mr. Howell, plaintiff's counsel, testifies that he understood this conference to be in the nature of a proposal of compromise. Mr. Mentz, defendant's counsel, testifies that he did not so understand. It seems to us that Mr. Howell's view is clearly erroneous. At this conference both parties were standing upon their rights, and neither was proposing to waive any part of same by way of compromise. The purpose of its calling was the discussion of the existing contract, not the formation of a new one.

The attorneys prepared and submitted to each other drafts of a new contract, but no agreement could be reached; and it all came to nothing, and things went on as theretofore.

On February 26, 1903, defendant's counsel, Mr. Mentz, wrote a formal letter to plaintiff, putting plaintiff in default with reference to the furnishing of canals and pockets for the operation of the pull boats, and protesting against the insistence of plaintiff that defendant should operate by the "fantail" process, and demanding that the canals and pockets be furnished in the same shape in which they had been furnished theretofore— that is to say, in accord with usage and custom.

To this letter the plaintiff, through Mr.

Howell, its counsel, replied that the plaintiff company insisted the fantail system was "just as practicable as the system insisted on by" the defendant company, and "denied most emphatically" that the system insisted on by the defendant was "in accord with custom and that heretofore followed under the contract."

While the fantailing question is not an issue in this case, it may be well to remark here, in passing, that the record shows that this process is used only when for some reason the other is impracticable; that it is much more expensive to the contractor and of doubtful economy to the contractee; also that it had not theretofore been used at all in the execution of the contract.

For want of canals and pockets, the pull boat No. 2 was, as a matter of fact, laid up on March 6, 1903, and did no work thereafter.

This was the situation when the breaking of the levee opened the prospect of a float, and Westmoreland summoned Coguenhem to Des Allemands for a conference.

### Deadening Circle.

Before taking up the matter of this conference, however, it is well that we say a word in regard to how far the question of cutting the tree at the deadening circle is provided for in contract, and how far it had, up to the time of this conference, been a subject of discussion between the parties. The clause relied on by plaintiff as imposing on defendant the obligation to cut the trees at the deadening circle is the same as that relied on as imposing upon defendant the obligation to bring the tree out in one piece, namely:

"It is further covenanted and agreed that the measurements of timber are to be made on the full length of the log, and that the diameter is to be taken at the small end."

We can but repeat in the present connection what we said of this clause in the other

connection, namely, that it has reference solely to the measurement of the delivered timber, and that if the parties had intended to depart from custom and usage and establish a special rule in a matter so important as that of how high from the ground the trees should be cut, they would not have left such special rule to be inferred from the peculiarity of the language made use of in providing for the manner of measuring the delivered timber, but would have taken the trouble to insert a special clause for the purpose.

Up to the time of the float no question had arisen in connection with the cutting at the deadening circle, and, in the nature of things, none could arise; for, as a matter of course, the deadening circle is cut where the tree is to be cut, and necessarily the tree is cut as low as practicable. Custom and usage on this point are well nigh as imperative as any contract could well be. Therefore up to the time of the float plaintiff had not had one word of complaint touching the height of the deadening ring, or the failure to cut at the deadening ring.

### Conference of March 31, 1903.

This was the conference called for by Westmoreland when it became certain that the water would get high enough in the swamp for floating. Westmoreland brought up three questions: (1) That the defendant should start floating from the back part of the deadened timber in the Paradis swamp, and come towards the front; (2) that defendant should cut at the deadening circle; and (3) that defendant should hold or harbor the timber in the swamp, and not deliver it in greater quantities than plaintiff could conveniently handle. Coguenhem brought up the question of the scarcity of rafting materials, and of the greater quantity that would be needed for holding the greatly increased number of logs. There is no denial that these questions were brought up at this con-

117 LA.—2

ference; but, as already stated, the witnesses disagree as to what was the understanding arrived at.

In so far as anything said at this conference might be sought to be proved for the purpose of showing a change in the written contract by subsequent verbal agreement on the two points of the right of plaintiff to control the operations of defendant and of the obligation to cut at the deadening circle, defendant objected to the evidence on two grounds: (1) That the petition did not contain any allegation of a change in the written contract by subsequent verbal agreement on the two points in question; and (2) that without special authorization from the board of directors the president of the defendant company was without power to change the contract, and that therefore any evidence of his having undertaken to do so would be irrelevant until proof had first been administered of such special authorization.

Both of these objections were sustained by the court. The court let in the evidence, however, for the purpose of showing what interpretation the parties put upon the written contract. The first objection was good. What has not been alleged cannot be proved, and such subsequent agreement is not alleged. The second offers more difficulty; but it need not be here passed on, inasmuch as the evidence, which, as just stated, was admitted for purpose of showing contemporaneous interpretation, does not show that the officers of the defendant company undertook to change the contract at this conference.

In their brief the learned counsel for plaintiff define their position in regard to the effect of this conference on the contract, as follows:

"If the contract itself should not be considered as settling the controversy concerning the right of the plaintiff to designate what swamp land should be pulled and what swamp land should be floated, then the manner in which the contract was executed by the parties sufficiently determines that question in favor of the plaintiffs.

"That manner of execution was established at the interview of March 31st.

"That interview is, therefore, not so much a subsequent agreement between the parties as it is an agreement establishing how the subsisting contract should be executed."

It may be well to put in a clear light the distinction which counsel here make between an agreement to change the contract and an agreement to execute the contract in a particular way. The one would be a new agreement, and the other nothing more than an admission as to the meaning, or scope, of an existing agreement. In other words the position of counsel is, not that at this conference Coguenhem agreed to change the existing agreement, but that he admitted that the existing agreement meant what plaintiff now contends for; that is to say, a particular meaning is sought to be attached to the contract by proof of a verbal admission on the part of Coguenhem.

If this admission were down in black and white, or if it were conclusively established, we might have recourse to it as an aid in the interpretation of the contract. But in the first place, while we know what the propositions of Westmoreland at this conference were, we do know whether they were advanced as matter of right under the contract, or as matter upon which an understanding or accommodation might be arrived at irrespective of contract. In the latter event the acquiescence of Coguenhem would not necessarily have amounted to an admission in regard to the existing contract. A person may agree to do a thing in a spirit of accommodation, without thereby admitting any obligation. In the second place, and what is still worse, we do not know for certain what was Coguenhem's reply.

Westmoreland, Elfer, and Leonard testify positively that Westmoreland made the requests or demands, and that Coguenhem unqualifiedly acceded to them. Coguenhem and Mayer deny that Coguenhem agreed to start at the back of Paradis swamp, and say

that his reply in regard to cutting at the deadening circle was that he would cut as was usual and customary. Hubert, plaintiff's bookkeeper, heard only the last words of the conversation. He heard Westmoreland say to Coguenhem, in a loud and emphatic voice, as they were going out, that he wanted his trees cut at the ring, and did not want his swamp butchered. Hubert does not remember the exact words of Coguenhem, but says that they were an assurance that everything would be all right. Dallas, plaintiff's witness, corroborates Westmoreland, Elfer, and Leonard on the point of Coguenhem's having acceded to Westmoreland's propositions, but says that he can give Coguenhem's exact words, and that they were: "All right, I will comply with this as far as practicable." "As far as practical." This would not have been an unqualified accedence, but, on the contrary, a qualified one, and would go in corroboration of Coguenhem and Mayer. Later on, in his cross-examination, Dallas says that what impressed him most was the cheerfulness with which Coguenhem complied with Westmoreland's requests:

"Q. Now, do you remember Mr. Coguenhem's exact language? A. No, sir; not word for word; expressed himself as willing to comply with Mr. Westmoreland's requests. Q. I just want to know what he said. A. I don't remember his exact words; no sir. Q. Well, didn't he reply that he would float the timber in the customary manner, etc.? A. As far as practicable; yes, sir. Q. In the customary manner as far as practicable? A. Yes, sir."

None of the witnesses undertakes to give Coguenhem's exact words, except possibly Mr. Dallas; but, as just seen, Mr. Dallas admitted later on that he could not give the exact words. On cross-examination, Leonard is asked:

"Q. Didn't Mr. Coguenhem tell him he would float the timber in the usual manner? A. Well, I would have entered a protest in regard to that he agreed to that, and then he wouldn't butcher up the swamp—guarantied he wouldn't butcher up the swamp. Q. Well, did he agree to that, is what I ask? A. Well, if I wasn't going to comply with a request I would have entered a protest. Q. Oh, you think because

he didn't enter a protest he agreed to it? A. That is the way I take it. Q. And simply because he wouldn't butcher up the swamp, you think he agreed to cut it at the dead line. A. Yes, sir."

Again:

"Q. As a matter of fact, he didn't make any protest, and you inferred from that that he agreed to it? A. Yes, sir. Q. That is your inference? A. Yes, sir. Q. That was the strongest expression you heard him use about the matter. A. Yes, sir. Q. That's the nearest to an acquiescence or bargain you heard him make, wasn't it? A. Yes, sir; I guess so."

Now, the question is, did Coguenhem admit that under the contract his company was bound to obey plaintiff's instructions in regard to the manner of proceeding in the taking of the timber, regardless of how impractical they might be, and was bound to cut the trees at the deadening circle, regardless of the impracticability of so doing, or did he merely give assurance that he would do things in the usual and customary manner, and would not butcher up the swamp.

If he admitted the former, then he receded from the position that he had occupied in his letter of two months back: "We did not then recognize your right to interfere with our work, and do not now"—which same position he occupied a few days later at the conference of January 28th in Downman's office in New Orleans, when Mentz called upon Westmoreland to point out any clause in the contract giving such right, and Westmoreland was unable to answer. It is highly improbable that the same man who had so recently challenged this right should now so cheerfully admit its existence. It is also highly improbable that Coguenhem, an experienced swamper, should agree to take this timber by proceeding from rear to front, when the evidence shows that the practical way of doing the work was by proceeding from front to rear. This is testified to by plaintiff's witness, Leonard, and is not denied by any of the swampers except by plaintiff's witness Kelso. Leonard's testimony on the point is, as follows:

"Q. Wouldn't it have been much easier to commence back there and floated the timber from there into the lake?

"A. It would, if they had roads cut there.

"Q. But it would not have been a great deal of trouble, if you didn't have a road, in order to get the timber, when you commence on the edge here?

"A. Well, they worked right there; they work back and put the road through.

"Q. Of course, they made a road as they went back?

"A. Yes, sir.

"Q. And that was a practical way of getting it out?

"A. Under the conditions it was.

"Q. A swamp that had not been prepared for floating, it was perfectly natural for you to start here on the lake shore, cut one tree, and cut a road to get it in, and then go 10 feet further, get another, bring it in, and so on? You think that was the proper way?

"A. Yes, sir.

"Q. And you think that was the practical way to have gotten at the timber, if they had floated?

"A. In that condition of the swamp.

"Q. And that was what prompted you in getting the timber out that way when you went in there?

"A. Yes, sir."

Leonard thought that Coguenhem's agreeing to cut the timber at the deadening circle during the flood was "the strangest thing he had ever heard." Strange, indeed, that an experienced swamper like Coguenhem should agree to cut at the deadening circle timber which had been deadened before the flood, especially when a high stage of water was looked for. The evidence shows that it would practically have been an agreement not to cut at all, for the axman stands in a boat on the surface of the water to cut the tree and the elevation of the cut must depend upon the elevation of the water. The tree being already partially cut at the ring, he prefers to cut there, if practicable; but if this ring be too low, and especially if it be under water, he is bound to cut above it. That Coguenhem never agreed to anything so absurd as to undertake to cut this timber at the deadening ring during the high water there cannot be the slightest doubt. For so agreeing he would have had to be a greenhorn or an idiot, and he was very far from being either.

He doubtless, and very naturally, gave plaintiff every assurance that it was possible to give on the subject, that he would cut at the circle "as far as practicable," that he would not "butcher the swamp," etc.; but beyond this he could not have gone without practically renouncing his contract. Of course, if the contract had required him to cut at the circle, he would have been bound to admit the fact; but we have seen that the contract contained not a word on the subject.

Plaintiff was insisting upon a punctual delivery of timber during the float. If so, it had to allow defendant to cut the trees in the way shown to be usual and customary, and not in an impractical, or impracticable, way.

Our conclusion must be that any admissions that may have been made by Coguenhem at this conference are not before the court in such shape as to be relied on with any degree of certainty. Verbal admissions are unreliable evidence at best. Especially when the question relates to the interpretation of a contract. Even in connection with a signature, this court has said: "It is the very weakest species of evidence." Plicque and Lebeau v. Labranche, 9 La. 559. Of admissions generally this court said in McKown v. Mathes, 19 La. 544: "Evidence of this kind is of the weakest character." And that estimate of the weight to be attached to verbal admissions has been so often repeated in our jurisprudence as to have become axiomatic. One of the reasons usually assigned for the weakness of this kind of evidence is its liability to error, especially when its exact language cannot be given. Elliott on Evidence, p. 242.

The patent error of Westmoreland, Elfer, and Leonard in their statement regarding the agreement to cut the trees at the ring, which it is simply impossible to believe Coguenhem agreed to, detracts greatly from the weight of their statement touching the agreement not to float from the pull-boat territory. They are equally positive as to both; and, if in error as to one, why not as to both? So far as Westmoreland is concerned, we have seen that he was equally positive that at the conference at Bowie, on January 8, 1902, Coguenhem had agreed to take the six-inch timber; and yet we have seen that he was contradicted in that statement by Wise, the notary, a perfectly disinterested witness, and by the written instrument drawn up for the express purpose of evidencing the agreement of the parties.

Counsel base an argument on the circumstance that the conference was harmonious; the argument being that things would not have been so pleasant if, instead of yielding to Westmoreland's wishes, Coguenhem had opposed them. The situation was that Westmoreland had attempted once before to interfere with defendant's work, and had met resistance, and had been unable to point to any clause in the contract justifying his action; that there was not a word in the contract about cutting at the circle, and that to ask defendant to do so when the circle might be level with, or below, the water, was practically to propose to defendant to forego the right to cut at all; and that the third proposition, that defendant harbor the timber in the swamp and do not deliver it in inconvenient quantities, was of doubtful foundation in the contract, whereas plaintiff's obligation to furnish rafting materials was one which fell squarely within that clause of the contract requiring plaintiff to furnish defendant with "such chain dogs as may be necessary," with no restriction upon the number of logs defendant might want to float at one time, so that plaintiff was menaced with having to furnish an enormously increased quantity of rafting materials. Those were the points that came up for consideration; and upon them Westmoreland received the assurance that defendant would harbor the logs in the

swamp by means of a boom constructed at its own expense, and would deliver them in quantities as desired, and would in other respects comply with his desire as far as "practical," or "practicable," or would proceed according to usage and custom. It appears to us that Westmoreland would have been highly unreasonable in demanding more, or in not being satisfied with that much, and Coguenhem would have sacrificed the interest of his company had he agreed to more. Had he agreed to more and done it cheerfully, his cheerfulness might well, under the circumstances, have "impressed" Dallas, and his compliance have appeared to Leonard as being "the strangest thing in the world."

### Confirmatory Letter.

Plaintiff lays great stress upon a letter that Westmoreland wrote to defendant nine days after the conference of March 31, 1903, as being confirmatory of what had taken place at the conference, which letter, it is said, was acquiesced in by defendant, who failed to reply to it. This letter reads as follows:

"Dear Sirs: As it now seems to be an assured fact that you will be able to float, we beg to confirm verbal conversation which the writer had with your Mr. Coguenhem some days ago, in which we stated that we would expect you to float, starting from farther end of the brake of timber in question. Your Mr. Coguenhem will very readily understand what we meant by this, as it was explained to him fully in person. We must also insist upon all trees being cut to the full length, as we do not propose to lose one single foot of any tree. We will also expect you to hold all timber, both large and small, in the swamp, and only deliver to us such quantities as we may designate, as it will be impossible for us to hold more than two or three days supply at this point. You will therefore please instruct your various foremen here as to the above, and also notify them to let us know before they start out with any timber from the swamp, so that we can let them know exactly how many sticks we can take care of. We particularly mention this, as we understand you have four or five hundred trees already floated. We cannot receive these in any one tow; in fact, we hardly think we can take care of half of them. Please, therefore, be governed accordingly. We remain."

Plaintiff says that to confirm a conversation by letter is a good business precaution, and that, not having answered the letter, defendant is bound by its recitals. In fact, plaintiff claims that the letter operates as an estoppel upon defendant; that the lawyers who brought the suit took it to be a correct recital of the understanding arrived at at the conference; and that, they having thus acted on this letter, defendant, who by silence had recognized the correctness of its recitals, is estopped from now occupying a contrary position.

But this letter, in the first place, contains not a word about cutting the trees at the ring. Westmoreland, on cross-examination, admits that the letter says nothing about cutting the trees at the deadening circle. He says, however, that the letter insists upon the timber being brought out the full length of the tree, and that this is the same thing as cutting at the ring. In this contention he is in a sense correct, since the tree is not brought out its full length if cut above the ring; but, in the same sense, the tree is not brought out its full length unless cut level with the ground, and, in our view, it is not more unreasonable to require the tree to be cut level with the ground, when there is no water, than to require it to be cut level with the water, or below the water, when there is water. Later on in his cross-examination Westmoreland says:

"I didn't think there was anything mentioned at that meeting about cutting the full length of the tree, but we had always had that understanding."

Still later on he invokes another part of the letter as having been intended to have reference to the agreement to cut at the ring, thus:

"Cutting the full length of the tree was an old proposition that we felt they always understood. I merely reiterated it, and as far as the second part of that sentence, that we do not propose to lose one single foot, that applies right directly to the deadening ring—to the agreement we had regarding the deadening ring."

All this, evidently, is a labored effort on the part of Westmoreland to put into this letter a reference to cutting at the ring, when as a matter of fact it is silent on that point. According to this new interpretation of the letter, the sentence, "We must expect all trees to be cut full length, as we do not propose to lose a single foot on any one tree," has reference in its first member to the cutting of the tree at the top, and in the second member to the cutting at the bottom; i. e., at the ring. This is farfetched in the extreme. Evidently, if Westmoreland had intended to refer to a special agreement to cut the tree at the ring, he would have done so, and would not have contented himself with the vague declaration of a determination not to lose a single foot of timber, which, if taken literally, would mean that the trees must be brought out root and branch, which, therefore, was a mere figurative expression, and not the enunciating of a contract. It is perfectly plain that during a flood, as well as when there is no flood, the expressions "bring the tree out full length and not lose a single foot of timber," when used in connection with the execution of an ordinary contract to bring out timber, mean no more than to bring out the tree in an honest, businesslike manner, according to the spirit of the contract. It means to cut the tree as near the foot and to top it as near the head as circumstances will permit. It is futile for any one to contend that these expressions were intended to serve as a contemporaneous memorandum of a special agreement to the effect that during the flood the trees should be cut at the ring. If, therefore, this letter was intended to serve as a contemporaneous memorandum of what had taken place at the conference, the memory of its author failed him on one of the points that had come up at said conference.

And it would have failed him on another point. He testifies that at this conference Coguenhem agreed to furnish his own rafting materials for holding the timber. In the letter he makes no allusion to this, and here would be another point on which the letter would be defective, if intended to serve as a memorandum of the result of this conference.

Finally, the letter does not say that defendant has agreed to "start from the further end of the brake," but that the writer of the letter, in view of their conversation on the subject, "expects" that defendant will do so. It confirms the fact that at this conference Westmoreland expressed the desire, or expectation, that defendant would do as indicated; but it does not undertake to assert that defendant admitted an obligation in the premises.

Besides, when a letter confirmatory of a business conversation is to be written, good business principles would require that it be written just as soon after the close of the conversation as possible, and surely not later than the night of the same day, if circumstances will permit, whereas this letter was written nine days afterwards.

Our conclusion is that this letter was not intended to serve as a contemporaneous memorandum letter, but was simply one of the numerous letters Mr. Westmoreland was in the habit of writing.

The expression, "We confirm conversation which the writer had with your Mr. Coguenhem, in which we stated that we would expect," etc., coming from the average business man, would carry with it a very strong implication that the statement had been agreed to and that the expectation was founded upon a positive agreement; but Mr. Westmoreland appears to be given to jumping to a conclusion favorable to his side on any question, and to being very positive and emphatic in asserting it. Once before he had claimed in the most positive manner this right to dictate to defendant, and had gone so far as to assert that defendant by disregarding his in-

structions was violating the contract, and yet had been unable to point to any clause of the contract upon which such right could be founded. He had been equally one-sided in his insistence upon the use of the Doyle rule, and again in the matter of the computation of the contents of the logs, when his own attorney had ruled against him. He had understood defendant as having agreed at the conference of June 14, 1901, to take the six-inch timber, and yet nothing of the kind had been agreed to.

### Estoppel.

The letter does not purport to confirm anything except the fact that Westmoreland had a conversation with Coguenhem, and that in the course of this conversation Westmoreland stated to Coguenhem that he would expect Coguenhem to "start from the further end of the brake." Nothing is said about contractual obligations. Such a letter did not necessarily call for an answer. Coguenhem had already given every assurance he could be expected to give on the subject, and probably had nothing further to say.

Moreover, defendant's failure to answer the letter could operate as an estoppel only if plaintiff had been led thereby to change its position; but plaintiff continued to occupy the same position precisely. The bringing of a suit is not a change of position within the meaning of the law of estoppel. The suit cannot create rights, nor change the legal situation. It can only enforce the existing rights, such as they happen to be. A litigant cannot create an estoppel against his adversary by merely filing a suit against him.

### Defendant's Mode of Operation.

On the assumption that defendant was not bound to cut the trees at the circle, but had a right to cut them in the manner usual and customary in such cases, the proof is overwhelming that the trees were cut lower than

usual. Indeed, plaintiff not only does not deny that fact, but seeks to turn it into an argument against defendant. Cutting lower than usual amounts, it is said, to an admission of the obligation to cut at the circle. The proposition involves a non sequitur. Had defendant cut at the circle, notwithstanding the difficulty, or impracticability, of so doing, or had defendant abstained altogether from cutting, owing to the difficulty or impracticability of cutting at the circle, then defendant's conduct would have indicated a sense of obligation to cut at the circle. But the cutting lower than usual (though above the circle) indicates nothing more, in our view, than a purpose to comply, as far as practicable, with the request that the cutting be at the circle. Defendant gave assurance that it would do so, and the unusual lowness of the cut indicates a purpose to live up to the assurance thus given. Counsel's argument presupposes an indisposition on the part of defendant to carry out the contract in a spirit of liberality, or even of conservatism, though nothing is to be found in the record to justify such an assumption.

In giving a reason for desiring that defendant should start floating at the rear of Paradis swamp and come forward, instead of starting at the front and going back, plaintiff has shifted its ground. Westmoreland states this reason, as follows:

"I told Mr. Coguenhem that, as there seemed a very good prospect of there being a float, I knew full well under the terms of the contract that he would be permitted to float, but that I wanted a thorough understanding with him as to the methods that he proposed to use in floating, so as to avoid any misunderstandings in the future. Mr. Coguenhem asked me to state in particular what I meant, and so on. I told him that, first of all, I wanted him to start floating from the back of the swamp and to float towards the outer edge, or to the edge next to the lake, for the reason that the swamp next to the edge of the lake was already prepared for the pull boats, canals and pockets having been dug and dredged, so that in case the water receded, they would be able to go to work immediately with the pull boats, and keep them running continuously; whereas, if

they floated from the pull boat grounds first, and the water receded, then we would be left without any canals and pockets for them to go to work in, and they would put us in default for keeping their boats idle."

Counsel, after stating that plaintiff had invested $20,000 in dredge boats and other accessories, and that the canals and pockets theretofore dug were said to have cost $10,000, proceed as follows:

"With such expense incident to the designation of a swamp for pulling, it would have been extraordinary, shortsighted, reckless, and suicidal for the plaintiff to enter into a contract which would enable the defendant to totally deprive it of all benefit from such work and expenditure, by treating a swamp so prepared for pulling as one prepared for floating. The result would have been that the plaintiff might have been called on for hundreds of thousands of dollars for preparing for pull-boating the immense bodies of swamp owned or controlled by it, without such preparation ever being utilized; for, as in the present instance, the defendant might in every case claim the privilege of floating off the timber, thereby putting the plaintiff to the additional expenses of preparing another swamp for pull-boating after the float had subsided. If there had been only one pull boat location to prepare with canals and pockets, it would not have mattered to the plaintiff whether the timber was pulled off or floated off. It would have gotten its timber in either case, and would have been put by floating to no additional expenses for further preparation. Although the expense of preparing the swamp would have gone for naught, the loss would not have any after effect.

"But the contract extended over a number of years, and affected an immense body of swamp land, and if a tract was prepared and designated for pull-boating, and the timber was thereupon removed by the shorthand process of floating, it would have been necessary for the plaintiff to at once prepare another swamp for pull-boating. The cost of the preparation of such other swamp would have been a direct loss to the plaintiff, due to the rapid floating off of the timber from the swamp prepared for pull-boating."

The reason which Westmoreland assigns is that, if all the timber made accessible to the pull boats by the canal were taken during the float, the plaintiff would not have any canal ready dug for defendant to operate in immediately after the float. The reason which counsel assign is that the expense of digging the canal would have been wasted. Westmoreland's reason has a semblance of

support in the facts, though, as we shall show presently, it has no real support; but counsel's reason has no support whatever in the facts. It loses sight of the fact that the canal so far as it had been completed was but the beginning of a longer canal, and that consequently, even if there had not been a solitary stick of timber made accessible by it in so far as completed, plaintiff would have had to dig it all the same. The timber had been deadened only up to a certain distance in the Paradis swamp, and the canal had been dug only part of this distance. Back of the deadened timber lay 1,200 acres of green timber, which could be reached only by a prolongation of this canal. There was no question of removing this green timber during the float. Therefore the floating of the timber made accessible by the canal in so far as completed would not have added one dollar to plaintiff's expenses.

Westmoreland's reason, we say, has only an appearance of support in the facts. It seems reasonable that, all things being equal, defendant should, even as a matter of accommodation, if not of actual contract, consent to float from that part of the land not already made accessible by the canal, and reserve for the employment of the pull boats immediately after the flood that part already made accessible; in other words, proceed in such manner as not unnecessarily to cause annoyance and embarrassment to plaintiff— as not unnecessarily to put plaintiff in default. But the fact of the matter is that for floating the timber which stood deadened in this Paradis swamp the proper place to begin was the outer edge of the swamp, as defendant did. This is shown by the testimony of Leonard, already quoted in this opinion, and also by the testimony of Walker. The further fact is that defendant's idea was to remove during the float every stick of the timber that stood deadened in this Paradis swamp. Walker testifies, and there is no reason to doubt his statement, that if any

timber had been left it would have been left next to the canal, to be taken by the pull boats. And the further fact is that when plaintiff undertook to do the same work it proceeded in the same manner.

## Contract Not Violated.

Our conclusion is that defendant has not violated the contract. For pretending to a case against defendant, plaintiff must rely upon strained interpretations which the contract will not bear, and for reinforcing these more than doubtful interpretations it must rely upon the letters of Westmoreland and upon alleged verbal admissions. The court would be the more loth to condemn defendant upon these letters of Westmoreland and alleged verbal admissions from the fact that in every one of its disputes with Westmoreland defendant has been found to be in the right and Westmoreland in the wrong. We refer to the Scribner rule, to the mode of computation, to the location of the pull boats, to the six-inch timber, and to the fantail process. We are impressed with the fact that the experts whom plaintiff's agent took into the swamp for the condemnation of defendant returned a verdict in favor of defendant, and that the unanimous verdict of the experts was that the stumps were unusually low, so much so that plaintiff's learned counsel have sought to turn that circumstance as a weapon against defendant.

We are further impressed with the absence of complaint during the entire time of the float, although the two agents of plaintiff kept close watch. The timber was received and measured without demur. The tow as to which plaintiff made complaint had not been gotten out by defendant, but by a subcontractor, Comeaux, and hence what fault there had been was that of this subcontractor. Defendant promised to investigate, and it did so, and found that this particular tow had been gotten out under difficulties. (See testimony of Walker.) Much of defendant's work was being done by subcontractors with whom defendant settled on the same basis as with plaintiff. Knowing that plaintiff was keeping close watch over its work, and knowing that Westmoreland was wide awake to the rights of plaintiff and had in the past manifested a disposition to exact rather more than less of the full measure of these rights, and knowing that this float, which reduced enormously the cost of getting out the timber, was its golden opportunity to reap a harvest under the contract, defendant would hardly have jeopardized its position by the penny-wise and pound-foolish policy of doing things that would justify plaintiff in arresting the further execution of the contract.

## Amount of Damages.

Plaintiff, by taking up and going on with the work that defendant was to do under the contract, and by breaking up all of defendant's arrangements and preparations for carrying out the contract, has put the further execution of the contract by defendant out of the question; and hence, as it is found that plaintiff's suit was groundless, the only remaining question is the amount of the damages to which defendant is entitled.

We take from defendant's brief an abbreviated statement of the damages as itemized in the answer, to wit:

"That said injunction is wanton, malicious, was secured without right or excuse, and had damaged defendant in the following sums:

"(1) In the sum of $25,000, for money expended in securing pull boats, paraphernalia, etc., to perform said contract, the same being without value without said contract.

"(2) In the sum of $5,300, expenses incurred in preparing the timber for floating, by deadening, trailing, cutting roads, cutting down timber, purchasing float boats, making pile booms, cutting wood, etc.

"(3) In the sum of $10,000, due for timber in various stages of floating, some being ready for floating out of the swamps, some in the boom ready for towing, and other portions of it actually in the boom at plaintiff's mill when the injunction issued.

"(4) In the sum of $46,875, the amount of profit defendant would have realized by float-

ing 12,500,000 feet of timber out of the swamp at a profit of $3.75 per 1,000.

"(5) Further, that under the terms of the contract defendant was to float, during five years or more, all the timber in large bodies situated on Lake and Bayou Des Allemands and their tributaries, working until all was floated; that it would have taken five years or more to pull all said timber; that it would have pulled 1,000,000 per month, or 60,000,000 during said five years, at a profit of $1.50 per 1,000, making a total of $90,000, which was prevented by plaintiff's active violation of the contract, by its failure to furnish canals and pockets, and by the illegal issuance of the injunction.

"(6) That it has been damaged in the sum of $2,647.50 on account of the failure of the plaintiff to cut the canals and pockets necessary to keep its boats busy; the expense of maintaining them when idle being the sum named.

"(7) That its pull boat No. 1 was idle for 36 working days, and its No. 2 was idle for 49 working days, during which time they could have pulled 1,700,000 feet of timber, making $2,550 lost thereby.

"(8) That plaintiff is actually indebted to defendant in the sum of $248.38 for logs already delivered to them.

"That, since plaintiff has made it impossible to perform said contract, defendant should be relieved from any obligation thereunder, and that it should recover from plaintiff, and from R. H. Downman personally, the sums recited.

"(9) Defendant avers its privilege on all the logs judicially sequestered, and that it is entitled to $10,000 attorney's fees and expenses incurred in attending court.

"And it prays accordingly."

Plaintiff excepted to any evidence being admitted in support of this claim for damages, on the grounds, first, that the averments were not sufficiently specific, and especially that it was not shown how the pull boats came to be lost to the defendants; second, that the damages claimed were too remote, and especially as to future profits, dependent upon contingencies; and, third, that the claims were cumulative.

It is needless to discuss these objections at any length. As to the averments, they are clearly sufficient. As to the profits, the making of them was the sole motive of defendant in entering into the contract. They were the sole inducement held out by plaintiff to defendant for entering into the contract. If profits such as these are remote, then the inquiry would be pertinent, when could profits flowing from the breach of a contract

be proximate? Whether the proof of them is sufficiently certain to serve as a basis for judgment is another question. As to the objection of cumulation, it is in part well founded, but only in part. The matter appears to us to be plain, not calling for discussion. On all timber delivered and not paid for defendant is entitled to full contract price. On all timber that was not delivered, but that would have been delivered if plaintiff had not prevented the full execution of the contract, defendant is entitled to full contract price, less whatever further expenses it would have had to incur in the fulfillment of the contract. To illustrate: For the logs already at the mill, and not yet paid for, defendant is entitled to claim the full contract price. For those logs as to which the sole remaining expense was the towing, defendant is entitled to claim full contract price, less cost of towing. For the trees cut down, but not floated out, defendant is entitled to claim full contract price, less cost of getting out, etc. For the deadened trees, defendant is entitled to claim full contract price, less all costs except that of deadening. For the green timber, defendant is entitled to full contract price, less total cost; that is to say, is entitled only to the margin of profit. Beyond this defendant is entitled to nothing. In computing the damage the court will divide the timber into these four categories, and allow the full contract price, less the amount of the expenses yet remaining to be incurred in order that the contract price should be due.

Plaintiff contends that defendant is entitled to nothing, not even for the money expended in deadening the trees, and on the 3,000 odd logs already afloat and in various stages of delivery, of all of which plaintiff profited. The argument is that defendant was losing money, and would have gone on losing money, and was secretly glad of putting an end to the contract. This argument is at variance with the allegation of the

petition that the price of the contract was a high price. If for pull-boating the price was high, how much the higher was it for floating, which is admittedly a very much cheaper process. There can be no serious question that the flood was a golden opportunity to defendant, and that defendant was actually engaged in making the most of it when the injunction was sued out.

Plaintiff argues that Coguenhem admitted that his company was losing money. The facts in that regard are these: In December, 1901, at the beginning of the execution of the contract, Coguenhem, in appealing for a settlement, used the expression that he had been executing the contract faithfully "to the extent of a loss to ourselves;" and at some other time, not fixed, he said to Dallas that, owing to the frequent interruptions he was having in his work, he was losing money; and at one of the conferences he said he was losing money. We find nothing in all this worth dwelling upon. Business men not unfrequently complain of their losing money, when they do not know whether they are or not, and really do not mean to make any serious assertion on the subject.

It may be well to notice here a charge made in the oral argument, and repeated in the brief, that defendant "doctored" its books. An expert accountant in the employ of plaintiff spent a week on the books, and if there had been anything wrong about them the matter could have been, and no doubt would have been, called to the attention of this court. The sole facts upon which the charge is founded are that the bookkeeper transferred certain items from the operating expenses account to the investment account; and that this was done after the books had once been brought into court and examined by plaintiff and had been returned to defendant. But the books were not returned to defendant until every account in them, by order of the court, had been closed by the clerk of court in red ink; and the changes

in question, three in number, were entered below these red marks, and as a matter of convenience.

Coguenhem, Walker, and plaintiff's bookkeeper, Winchester, put at 25 cents the cost of towing the timber after it is brought out of the swamp. Plaintiff would make this cost out to be 76.4 cents by asking Winchester whether all amounts charged to the steamers Richmond, Bertha C., Ruth, Armead, Naomie, and Edna D. were not for towing, and whether, if the towing cost $9,700.26 and the number of feet towed was 12,691,645, the cost would not be 76.4. Where the counsel got the figure of $9,700.26, the court is not informed. The court has searched in vain in the unindexed volume 5, containing the books of the defendant company, for it. But, assuming that it represents the amount figuring against said boats on the books, nothing shows that the only towing the boats did was of timber. As the witness observes to cross-examining counsel:

"You are assuming all the time this amount only represents the towing of timber."

Walker testifies that the first year the defendant made 59 cents and the second year, $1.40, and the third year, $1.11, or an average of $1.16, profits per thousand feet of timber. Counsel point out that on the basis of this computation defendant would have realized $14,722.30 of profits in the 22 months the defendant was operating, whereas Winchester, defendant's bookkeeper, shows that the profits amounted to only $6,251.38. The computation made by Walker is founded on actual figures, and hence cannot be as far out of the way as counsel would here contend; and, as the court proposes to rely to some extent on Walker's computation, a few words explanatory of why the comparison here made by counsel is misleading may not be out of place. The two figures do not stand for the same thing. Winchester at the end of defendant's operations deducts the liabilities from the assets and finds the above

balance. Walker takes no account of capital stock, or interest on money invested, or of salaries of officers, but takes simply the actual cost of operating the pull boats, and allows $10 per day for wear and tear, and deducts this from the contract price for the timber. If, from the result brought out by his mode of computation, there be deducted the $5,350 of the capital stock, and the salaries of the officers, his figures, instead of being much out of the way will be found to correspond approximately with those of Winchester.

By this, however, we do not mean to imply that the result found by Winchester is correct; for it represents, as we understand, nothing more than the general result on the books, and leaves out items that ought to appear, and includes others that ought not to figure. For instance, as counsel well point out in their brief, it puts on the credit side the full amount expended on the pull boats as representing their present value, whereas a deduction of $10 per day should be made, which represents as to boat No. 1 $2,000, as to boat No. 2 $1,500, and as to boat No. 3 an amount we have not the time to look up in the record. We assume here that the wear and tear on the boats is $10 per day, even when idle. And on the debit side it includes one item of $400, loss incurred in towing a barge for the plaintiff company, as a matter outside of the contract. There may be other items pro and con. The books of the defendant company are copied in the transcript in such shape as to be a sealed book to the court, except in so far as referred to by page in the briefs.

We do not agree with counsel for plaintiff that from the assets of defendant the amounts due by the subcontractors should be stricken out as bad debts, The money had been expended in the partial execution of subcontracts which the injunction put an end to; non constat that it would not have been paid, had plaintiff allowed the subcontracts to be fully executed.

The point is of no great importance, however, as the court, in the computation of defendant's future profits, does not propose to guide itself by the amount of the profits realized under the contract in so far as executed. To do so would be manifestly unsafe. For the execution of this large and important contract, having five years or more to run, defendant had to build from the ground up, had to organize a system of labor for operation in an uninhabited country, and—a by no means insignificant consideration—had to contend with the slowness and default of plaintiff in furnishing the canals and pockets in which to operate, and with the reluctance, tardiness, and failure of plaintiff to furnish a sufficiency of rafting materials. The results at the inception of the execution of such a contract, and under the circumstances, cannot be taken as a safe criterion of what the results would have been in the latter years of the contract, and especially during the float.

Even then, however, if all the expenses which defendant had incurred, up to the date of the injunction, upon the timber and in preparing the swamp for floating (all of which it was yet out of pocket), be added to the assets side of the balance sheet, some considerable profit would be shown. Granting that defendant's exhibit showing $18,518.79 is to a great extent incorrect, still there would be a considerable profit.

### Amount of Profits.

J. M. Smith, swamper for 13 years, thinks that to get out timber by floating from a swamp like the Paradis swamp, with a lake in front and a sea marsh on two sides, ought not to cost more than $2 per thousand at the outside. This means to get the timber out into the lake, not including the cost of rafting, nor of deadening. Witness, the same season, got 2,400 trees with 15 men in the space of six weeks; 2,100 for himself, and 300 for another.

John Constant was getting out timber for defendant in the Paradis swamp at $2 per

thousand when the injunction came, and would have continued at the price but for the injunction.

Geo. Vincent had been engaged in the swamping business, pull-boating and floating, for the last 15 years; not done a great deal of floating; floated in Atchafalaya swamp in 1884 and 1903; went over Paradis swamp; could pull the timber for $3.50 per thousand; $4 would be an outside figure. That includes all expenses for preparations, interest on money invested, and everything. The timber could be gotten out by floating at $2 to $2.50; the latter being an outside figure. The Paradis swamp is an easy one to float.

Haley Cotton, swamper since 1886, has floated and pull-boated. Examined Paradis swamp. Timber could be floated for about $2. The timber already deadened could be gotten out at a cost of $1.50. Has run a pull boat off and on for nine years, and regularly for the last five years. Pulling the timber would cost $3.50 to $4, including everything. Got out 6,000 trees for himself same season, averaging 700 feet; floated two months and had 35 men employed.

Gus. Drew, sawmill, lumber, and swamping business since 1882, also president of bank, visited Paradis swamp. Timber could be floated at $2.50 per thousand. Timber averaged 19 to 20 inches, and would run 500 to 600 feet. His estimate includes rafting.

F. J. Nuttall, timber estimator for F. B. Williams & Co.: Williams paid $3 per thousand for floating timber in 1893. This includes deadening, trailing, and floating.

Emile Angelo, engaged in swamping business since 1890, owns three pull boats, and has both floated and pull-boated by contract. His cost of floating in 1903 ranged from $2.10 to $2.25. Paradis swamp should be floated for less, because there would be less trailing; say for $2.

G. G. Walker, experienced swamper, examined Paradis swamp. He estimates cost of floating at $2 and of pull-boating at $3 to $3.50.

John Sanders, experienced in swamping: Considering the openness of Paradis swamp, it would cost less than $2 to float the timber out.

John Sanders, experienced in swamping: Considering the openness of Paradis swamp, it would cost less than $2 to float. Constant, Bell, and Williams: To float timber at $2 per thousand.

Winchester, testifying from the books of the defendant company, shows that, computing a day's work for one man as one man, the number of men employed and the number of logs floated out by defendant were as follows:

"April 7, 8 men floated 58 logs.
"April 8, 18½ men floated 125 logs.
"April 9, 15 men floated 113 logs.
"April 10, 13 men floated 108 logs.
"April 11, 18½ men floated 60 logs.
"April 13, 27 men floated 128 logs.
"April 14, 21 men floated 118 logs.
"April 15, 26½ men floated 180 logs.
"April 16, 25 men floated 105 logs.
"April 17, 33½ men floated 136 logs.
"April 18, 27 men floated 125 logs.
"April 20, 34 men floated 171 logs.
"April 21, 39½ men floated 235 logs.
"April 22, 40 men floated 166 logs.
"April 23, 47½ men floated 161 logs.
"April 24, 45 men floated 199 logs.
"April 25, 42 men floated 219 logs.
"Or 475 men floated 2,407 logs.

"These floaters averaged $2 per day, including board, making $950. On the basis of 350 feet to a log, it would make 842,450 feet, and cost $1.12 per thousand; on the basis of 300 feet to a log, it would cost $.31 per thousand. To each of which 25 cents per thousand should be added for towing.

"It would thus cost $1.37 and $1.56 per thousand delivered at the mill, respectively, as the logs averaged 300 or 350 feet."

The same witness, testifying from defendant's books, shows:

That from March 17 to March 30, 1903, pull boat No. 1, operating in Paradis swamp, pulled 541 logs, making 334,879 feet, representing under contract price..............$1,841 85
That the towing of this cost..$ 83 00
The deadening, etc.......... 844 00
Deterioration on pull boat at $10 a day for 14 days..... 140 00
——— 1,068 53

Profit ........................$ 773 32
—or a cost of $2.30 per thousand for pulling.

Walker testifies that the cost of running a pull boat is as follows:

Engineer, $2.50; fireman, $1.50; wire guider, $1.50; boomer, $2; wood passer, $1.50; whistle blower, $1.50; chain gang foreman, $2.50; four men under him, at $1.50, each, $6; board for each at 50 cents per day, $5.50; fuel, $7; wear and tear, $10. Total daily of running boat, $41.50.

That the boat will pull 40 logs per day, averaging 700 feet, or 28,000 feet, making the cost of pulling $1.50 per thousand. That the other expenses on the timber are the deadening and getting the timber ready for pulling, cutting up roads, and the towing, amounting to $1.95, which, added to the $1.50, makes $3.45, the total cost of getting the timber out by pulling.

Defendant had a contract with Commeaux for getting out the timber of Islands Nos. 2 and 3 at $3.50 per thousand. Commeaux was going on with the contract, and was well advanced with it, when the injunction stopped him. The further cost to defendant upon this timber would have been the towing, or 25 cents per thousand.

The moment defendant's hands were tied up by the injunction plaintiff took up the work where defendant had left off, and went on in precisely the same manner, hiring some of the same men, and even using for a while defendant's camp boats; and after the water had subsided plaintiff went on with the pulling process. Plaintiff, in rebuttal, offered to prove what had been to it the cost of the work, and the court ruled out the evidence, on the ground that it was not properly rebuttal. In this we think the court erred. But the error is not of sufficient importance to necessitate a remanding of the case, since it could not affect the result. The evidence is so overwhelming as to what the outside expense of floating timber should be that any results of its own which plaintiff might show to the contrary would have to

be attributed to its inexperience in the business. The court will, moreover, make allowance for the evidence by adopting the highest figure testified to by any of the experts, and that is $3 floating and $4 for pull-boating. This includes the cost of deadening and rafting, leaving to be added only the cost of towing, shown to be 25 cents per thousand.

On the pull-boating defendant is entitled to a profit of $1.25 per thousand, and on the floating to a profit of $2.25 per thousand.

That a large quantity of timber had been deadened, both in the Paradis swamp and in Islands Nos. 2 and 3, there is no question. As fixing the exact amount of this timber there is practically only the testimony of Walker; but, that testimony being uncontradicted, there is no good reason for not accepting it. He says that 23,000 trees had been deadened and paid for by defendant in the Paradis swamp, and 7,500 by Commeaux on Islands Nos. 2 and 3; that "about" 4,000 had been taken out of the Paradis swamp and 1,500 from the Islands Nos. 2 and 3. We will fix at 18,000 and 5,000, respectively, the number of deadened trees still in the two swamps on the day of the injunction; and we will fix the average number of feet per tree at 650 for the Paradis swamp and 250 feet from the Islands Nos. 2 and 3. Walker testifies that defendant would have floated out all this deadened timber during the float, and we think it would be perfectly safe to conclude that defendant would have floated at least one-half of it.

With respect to the deadened timber in the Paradis swamp the matter stands as follows:

Eighteen thousand trees, averaging 650, one-half equals 5,850,000 feet, at $2.25 per thousand, equal $13,162.50.

With respect to the deadened timber from Islands Nos. 2 and 3, the matter stands as follows:

Five thousand trees, averaging 250 feet,

one-half equal 625,000 feet. On this timber, however, defendant could not have realized more than $1.25 per thousand, as that was the margin of his profit under his subcontract with Commeaux. This would fix the amount of this item of damages at $781.25.

The contract of defendant had three years and one month more to run, and there was enough green timber in the Paradis swamp alone to have kept the boats of defendant occupied during this entire time. During the contract one pull boat was in operation 83 days, another 403, and the third, 118 days, making a total number of days for the three boats of 604. They pulled 10,516,063 feet, or 17,410 feet per day for each boat, or 52,230 per day for the three. Allowing 20 working days to the month, and the monthly capacity of the boats is 1,044,600. If we assume that the boats would do no more than supply the mill, we have 1,000,000 per month, which is the capacity of the mill, or 37,000,000, for the unexpired term of the contract, which, at $1.25 per thousand would amount to $46,250.

The foregoing represents the naked profit on the timber standing in the swamp. On that part of the timber which was in course of delivery defendant, as already explained, is entitled to recover, in addition to the naked profits, whatever part of the cost of delivering the timber had already been expended. For instance, on the timber already delivered, but not yet paid for, the amount which defendant is entitled to recover is $5.50, or full contract price, and not merely the naked profit.

Under the writ of judicial sequestration the sheriff of the parish of St. Charles seized 800 logs in booms and 300 on the edge of the swamp; the sheriff of the parish of Lafourche seized 2,282 logs—a total, between the two sheriff's, of 3,382 logs.

It seems that on the day itself that the injunction was served a storm scattered the logs over the lake and sea marsh, and a great many of them were lost and could not thereafter be counted. Plaintiff had a considerable number of these gathered up and used them. Mayer, a few days after the service of the injunction, made an effort to count the logs, and, counting them as best he could, he found 3,210, whereof 1,182 were in Commeaux's canal.

Walker testifies that from the Paradis swamp 3,422 logs were gotten out during the float; that of these there had been delivered at the mill at the time of the injunction 1,197, leaving 2,225 boomed in different places in the swamp; that there were 466 logs in the mill boom, which were never measured or paid for by plaintiff, but were measured by Mayer and showed an average of 360 feet per log, or 167,760 feet.

Walker testifies, further, that 700 to 800 of the trees that had been cut down and prepared for pulling were left in the swamp. In another part of his testimony he fixes the number of these logs at 1,000. These logs not yet floated out were never counted, and it is not certain that they were not embraced in the 18,000 trees for which allowance has been already made, so that the court does not see its way clear to allowing anything on them.

On the 466 logs in the mill boom plaintiff is entitled to the full contract price, computed on the measurement actually made by Mayer; that is to say, $922.68.

Adopting the same measurement for the 2,225 logs from the Paradis swamp, but not yet towed to the mill, and we have 801,000 feet, which at the contract price, less 25 cents for towing, equals $4,205.25.

Fixing at 250 feet per log the 1,182 in the Commeaux canal, and we have 295,500 feet, which at the contract price, less 25 cents for towing, gives $1,551.37.

What loss defendant suffered from the fail-

ure of plaintiff to fully comply with its contract to furnish canals is not proved with sufficient certainty. It is shown that pull boat No. 1 was idle for 29 working days, and pull boat No. 2 for 48; but there is no evidence that the crews of these boats were retained part and were not employed elsewhere during this time, except a vague statement of Coguenhem, in connection with the first day of idleness of one of the boats, to the effect that he did not dare discharge his labor. The wear and tear on the pull boats at the rate of $10 per day during the idleness of the boats is not testified to positively by any witness. Winchester is not positive on the subject, and Kelso virtually denies it, or, at any rate, had not had such an experience with his pull boats.

Recapitulating, we tabulate the items as follows:

(1) Deadened timber in Paradis swamp, 18,000 trees, averaging 650 feet, one-half equal 5,850,000 feet, at $2.25 per thousand............$13,162 50

(2) Deadened timber on Island Nos. 2 and 3, 5,000 trees, averaging 250 feet, 1,250,000, at $1.25 per thousand ........................ 781 25

(3) Profits under the contract during the 3 years and 1 month it had yet to run, 1,000,000 feet per month, during 37 months, at $1.25 per thousand ..................... 46,250 00

(4) 466 logs at the mill, averaging 360 feet, 172,132, at $5.50............ 922 68

(5) 2,225 logs in Paradis swamp booms, averaging 360 feet per log, 578,500 feet, at $2.25............ 4,205 25

(6) 1,182 logs in Commeaux canal, averaging 250 feet.............. 1,551 37

Total .....................$66,873 05

From that deductions must be made. Had defendant gone on with the contract, it would have to pay the salaries of its officers, and would have lost the interest on the money invested in its operating outfit; also it would have had these profits only as they accrued from month to month.

The salaries of the officers were per month, as follows:

President .........................$ 25 00
Manager ......................... 75 00
Bookkeeper ...................... 25 00
Mayer, agent, $125 and expenses, say $25 per month................. 150 00
    Total .....................$ 275 00

37 times $275 equals...............$10,175 00
Interest thereon at 5 per cent. for one-half of 37 months............ 848 33
                                 $11,023 33

Putting the value of the outfit at $19,000, the amount at which Coguenhem offered it to plaintiff, and we have the interest on this amount at 5 per cent. for 3 years and 1 month, which equals............. 5,415 00

Inasmuch as the future profits of $46,250 are payable and bear interest as of the date of judicial demand, May 25, 1903, whereas, had the contract continued, they would have accrued only from month to month, the mean interest from the date of the judicial demand to the date of the termination of the contract, June 9, 1906, at 5 per cent., must be deducted, viz............ 3,468 75

    Total .....................$19,907 08

Deducting the amount from the $65,737.34 leaves $45,832.01 as the amount of the damages.

As against R. H. Downman individually, on his alleged liability under the contract, the judgment must be set aside, as having been rendered without issue joined, either by default or otherwise.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, in so far as it condemns R. H. Downman individually, as a party to the contract, and that this suit, as against R. H. Downman individually as a party to the contract, be dismissed as in case of nonsuit; that said judgment be amended by increasing the amount thereof to $45,832.01; and that, as thus amended, it be affirmed, with costs in both courts.

On Rehearing.

MONROE, J. By the order granting the rehearing the present inquiry is "restricted to the question of the quantum of damages

to which the defendant may be entitled." In the opinion heretofore handed down, it was said:

"On all timber that was delivered and not paid for defendant is entitled to the full contract price. On all timber that was not delivered, but that would have been delivered if plaintiff had not prevented the full execution of the contract, defendant is entitled to the full contract price, less whatever further expense it would have had to incur in the execution of the contract."

Proceeding upon this basis, and considering, in slightly different order, the items which were dealt with in our former opinion, we now find that defendant is entitled to recover as follows, to wit:

(1) For 466 logs, averaging 360 feet and containing 167,760 feet of lumber, delivered, at $5.50 per thousand (the contract price)........$    922 68

(2) For 2,225 logs, averaging 360 feet and containing 801,000 feet of lumber, collected in booms, at $5.50, less 25 cents for towing, $5.25 per thousand ....................    4,205 25

(3) For 1,182 logs, averaging 250 feet and containing 295,500 feet of lumber, collected, in Commeaux canal, at $5.50, less 25 cents for towing, $5.25 per thousand........    1,551 37

(4) For 9,000 trees, averaging 650 feet and containing 5,850,000 feet of lumber, which defendant would have floated from Paradis swamp, at $5.50, less $3.35, for expenses, $2.15 per thousand..............    12,557 50

(5) For 2,500 trees, averaging 250 feet and containing 525,000 feet of lumber, which defendant would have floated from Islands 2 and 3, at $5.50, less expenses, $1.25 per thousand ....................    656 25

(6) For cost of deadening 9,000 trees in Paradis swamp, at 11 cents per tree ........................    990 00

(7) For cost of deadening 2,500 trees on Islands 2 and 3, at 5 cents per tree. ........................    125 00

(8) For loss by reason of depreciation in value of plant purchased for purposes of contract................    5,000 00
                                        ─────────
                                        $26,008 05

1. Item 1 is undisputed save as to an error in our former calculation which is now corrected.

2 and 3. As to items 2 and 3, defendant's counsel suggest that the amounts heretofore

117 La.—3

allowed were smaller than they should have been and did not conform to the theory of the opinion, since the logs represented in them were ready for delivery, without further expense save that of towing to the mill, which alone should have been deducted from the contract price. Plaintiff's counsel, on the other hand, contend that the deduction for towing should be 76 cents per thousand, instead of 25 cents per thousand, and rely upon the charge "for towing" as entered in defendant's books, from which, if those charges were applicable exclusively to the towing of logs, it would appear that the counsel are correct in their view.

It is not alleged that any other expense was to be incurred with respect to the logs in question than that of towing, and the obvious discrepancy between the theory of our former opinion and the decree, which was the result of mere inadvertence, has now been reconciled, as suggested by defendant's counsel. The contention of plaintiff's counsel fails to take sufficiently into account the evidence which has been adduced to the effect that the boats employed by defendant in towing logs were also engaged in other work, such as the supplying of the camps with laborers, provisions, and materials, and the towing of pull, tug, and dredge boats, and of barges laden with fuel, and that the entire expense was charged to the towing account. It is, however, necessary, in view of this testimony, to distinguish between the expense of towing logs and the other expense charged to the towing account, and in so doing we find that the expense of towing the logs ought not to have exceeded the amount which we have stated. In fact, whilst no witness who has been examined has undertaken to say that such expense would exceed 25 cents per thousand feet of lumber, several have testified that it could have been done for less, and we are of opinion that, in point of fact, it was done for less, by defendant.

4. Counsel for plaintiff question the sufficiency of the testimony of the witness Walker as to the number of trees deadened in Paradis swamp, and inquire why the court should have accepted it and have ignored the testimony of Gutekuntz, to whom they refer as an experienced professional estimator of timber. The answer is that we have not accepted the testimony of Walker as conclusive of the question, but only to the extent that it commands acceptance by its inherent probability and the support of other testimony. We have first deducted from Walker's estimate of the total number deadened 1,500 trees, and, after deducting from the remaining 22,000 the 4,000 trees removed prior to the issuance of the injunction, including the 2,225 placed in booms, have taken one-half of the 18,000 which remained, or 9,000 trees, as the number which we are satisfied that defendant would have floated from Paradis swamp. Walker testified that his object was to deaden a season's supply in advance, which we take to be a credible statement; and, as the mill turned out 50,000 feet of lumber per day, and would have consumed 22,000 trees, averaging 650 feet, in 286 days, it would have been improvident not to have deadened that number.

As to the testimony of Gutekuntz, that witness undertook, in reply to a question asked by plaintiff's counsel, to estimate the quantity of timber per acre in Paradis swamp, after having stated, when previously interrogated on the subject by defendant's counsel, that he was entirely unable to make such an estimate. We think he is the better judge of his own capacity; but, taking his estimate as made, he stated that Paradis swamp would "run" about 8,000 or 10,000 to the acre, and, on cross-examination, that he was not prepared to deny, if any one should so testify, that it might run 20,000 feet to the acre, and he estimated the number of trees at from 16 to 18 to the acre, which last figure would call for from 11,700 to 14,400 feet to the acre, as the trees may have measured 650 or 800 feet. Elfert, by whom the plaintiff was represented in Paradis swamp whilst defendant was operating there and afterwards, upon the other hand, testifies that there were from 10,000 to 20,000 trees deadened. He says:

"A. Nearer approximation, I think, would be 12,000; possibly, 15,000. Q. Possibly 20,000? A. Possibly; I never saw the list. I never counted the trees." etc.

It may be here remarked that the land, which for the purposes of this litigation is called "Paradis Swamp," appears to be so called as representing certain tracts (in the midst of a large body of apparently swamp land) which were acquired from Edward Paradis by the Bowie Lumber Company, and by that company transferred, quoad the timber, to the Des Allemands Company, plaintiff herein. Mr. Downman, who is president and practically owner of both companies, gives the following, with other, testimony, to wit:

"I forget the exact acreage of Paradis swamp, some 2,000 acres, though, and there were probably 3,000 or 4,000 acres back of Paradis swamp of timber, with timber on them, that might have been operated, probably, under this contract."

The deed whereby the property was acquired, as copied in the transcript, purports to convey the following described tracts, viz.: Fractional sections 13 and 24, township 14, S., range 19 E.; S. W. ¼ of N. W. ¼ and N. W. ¼ of S. W. ¼ of section 6, township 14 S., range 20 E.; W. ½ of E. ½ of fractional section 33, township 13 S., range 19 E.; S. ½ of N. W. ¼ and N. ½ of S. W. ¼ of section 18, township 14 S., range 20 E.; N. ½ of N. W. ¼ of section 18, township 14, S., range 20 E.; S. ½ of S. E. ¼ of section 28, S. ½ of S. W. ¼ of section 27, S. ½ of N. W. ¼, and S. ½ of N. E. ¼ of section 24, E. ½ of fractional section 33, all in township 13 S., range 19 E.; also E. ½ of E. ½ of section 6, township 14 S., range 20 E.; S. W. ¼ of N. E. ¼, N. W. ¼ of S. E. ¼, N. W.

¼ of S. W. ¼, and S. E. ¼ of N. W. ¼ of section 6, township 14 S., range 20 E.

According to the title before us, therefore, no land was acquired in section 34, of township 13 S., range 19 E. We infer, however, that there may be some error of description, and plaintiff's counsel have incorporated in a lately filed brief a sketch upon which the whole of the section mentioned, save N. ½ of N. E. ¼, is represented as included in the swamp of which plaintiff had control, and as a matter of fact it was upon that section, as also upon the fractional E. ½ of section 33 (adjoining to the west), and upon the S. ½ of S. E. ¼ of section 28 and S. ½ of S. W. ¼ of section 27 (adjoining to the north), that defendant, by plaintiff's instructions, operated under its contract. In the subjoined sketch we have shaded only the tracts called for by the title; but, taking those which plaintiff assumed to control, it seems that there were in the immediate field which was being operated when the injunction was issued 560 acres in section 34, 80 acres in section 27, 80 acres in section 28, and approximately 320 acres in fractional section 33, making a total of 1,000 acres.

It may be, on the one hand, that all of this particular land did not contain 22 trees to the acre, or that the whole of it was not operated; but, on the other hand, it does not appear that any one knew exactly where the lines were, and it is not improbable that, under the plaintiff's instructions, defendant deadened trees on land which is not included in the title which plaintiff sets forth, there being, as we should judge from the maps filed in evidence and from the testimony, including that of Mr. Downman, plenty of surrounding or adjacent swamp which bore the name of Paradis, though it may never have belonged to that gentleman, and the instructions under which defendant acted being in substance: "There is Paradis swamp. Go ahead and get the timber out." Upon the whole, we find no sufficient reason for doubting that 22,000 trees were deadened in what was called "Paradis Swamp." But, even if it were otherwise, it would not affect the immediate question under consideration, which is, how many trees would the defendant have floated out? since it might be assumed, for the purposes of that question, that only 13,-000 trees were deadened, a number which is fairly within the estimates of both Gutekuntz and Elfert. The remaining questions connected with this item are: Could the defendant have floated 9,000 trees during the remainder of the high-water period? and, if so, at what expense? The injunction was served on April 27th, and plaintiff thereafter floated timber until about June 1st, though it is probable that, during the last few days, only small trees were taken out in that way. We conclude that there were 28 days during which defendant might have operated to advantage, and within that time it would have been necessary for it to have floated timber at the rate of about 209,000 feet, or say 320 logs, averaging 650 feet, per day, in order to have taken out the 5,850,000 feet for which it is to be paid. During the same period of

high water, Smith, a disinterested witness, with 15 men, floated 1,500,000 feet in six weeks; Vincent, with from 15 to 25 men, floated 6,000 logs in four weeks, dragging them eight or nine miles by hand; and others floated far beyond the requirements of the occasion now under consideration. It appears from the evidence, too, that, conservatively speaking, 1 man will float 4 logs per day, and that in fact defendant, with an average of 25 men, floated an average of 130 logs per day during the 19 days from April 7th to April 25th, and that on April 21st, with 39½ men (days' labor), it floated 235 logs. It further appears that defendant had increased its force to something over 100 men, and had arranged for a further increase, from all of which we conclude that it is safe to hold that it would have floated the quantity of timber stated from Paradis swamp, and also as many as 2,500 small trees from Islands Nos. 2 and 3. As to the expense: Smith, Constant, Vincent, Drew, Nuttall, and Sanders, disinterested witnesses, testifying from experience, say that it should not have amounted to more than $3 per thousand, at the outside; the testimony of Nuttall being that, F. B. Williams, by whom he was employed, had floated 35,000 trees, through eight contractors, at $3 per thousand, from which it may reasonably be inferred that there was a profit in floating at that price. Walker and Mayer testify that the actual expense to the defendant was considerably under $2 per thousand, and, whether they are correct or not, our conclusion is that defendant made, during the float, practically the first profit that it had earned under its contract. To the amount of $3.25 per thousand, fixed by our former decree as the cost of floating this timber, including the towage, we have added 10 cents per thousand as the cost of completing the boom which defendant had begun and which would have been

necessary to hold the timber as it accumulated.

5. Having given our reasons for holding that defendant would have floated 9,000 trees from Paradis swamp and 2,500 from Islands Nos. 2 and 3, it is only necessary to say, in regard to the item 5, that we have fixed upon $1.25 per thousand as the amount to which defendant is entitled, because we understand it to be conceded that the balance of the profit goes, or would have gone, to a contractor.

6. The deadening of those trees in Paradis swamp which we have not found that defendant could have floated inured to the benefit of plaintiff, who should therefore pay the cost.

7. The same as to the trees on Islands 2 and 3.

8. Our re-examination of the record has led us to the conclusion that the evidence adduced affords an insufficient basis for a judgment for prospective profits predicated upon future operations with the pull boats. The defendant company, like the plaintiff, is practically owned by a single individual (Manuel Coguenhem), who is not inexperienced, whether in business generally, or in the particular business out of which this litigation arises. In the course of his testimony, he says: "I have been pulling timber right along for a number of years." And Mr. Coguenhem had associated with him from the beginning, as his superintendent and swamp manager, Mr. Walker, who has been operating in swamps, pulling timber and floating it, all of his life. It is therefore safe to say that neither Coguenhem nor Walker had anything to learn with regard to the portion of the business which he undertook, and, having entered into the contract with plaintiff with a perfect understanding of its requirements, they operated under it for nearly two years, during which time they delivered between 12,000,000 and 13,000,000 feet of lumber, for

which they were paid promptly, as the deliveries were made, amounts aggregating $71,500. And yet up to the period of the float, as we conclude from a somewhat laborious reconsideration of their testimony and financial statements, they had made no money, or, at best, but a few hundred dollars. It is impossible, therefore, in considering the testimony of the different witnesses, and in following the calculations by which they show, on paper, a profit in "pull-boating" at this or that price, to escape the significant fact that, after an actual experience of about 19 months, in what is said to be an easily pulled swamp, the defendant did not earn that profit. And we cannot disabuse our minds of the conviction that, had the plaintiff repudiated its contract at the beginning, and had the defendant sued for the prospective profits of five years, instead of three, we should have heard the same testimony, and might upon the basis of that testimony have found the same reasons for awarding profits for the first two years as have been suggested, and as might be found, for awarding prospective profits for the last three years. It is evident, however, that a judgment rendered upon that basis, in so far as concerns the first two years of the contract, would have been lamentably unjust, since it would have given to the defendant a profit which its actual subsequent experience has demonstrated it would not have earned, and to which, therefore, it would not have been entitled. Who can assure us that a similar injustice will not be perpetrated, should we now condemn plaintiff to pay the prospective and theoretical profits which are here claimed? Certainly not the witnesses upon whom defendant relies, for their testimony is as applicable to the one period as to the other, and shows as conclusively that defendant should have made money whilst it was actually operating, though in point of fact it made none, as that it should or would have made money if it were, or had been, allowed actually to operate during the period here in question; and, as that testimony would have afforded an unsafe basis for a judgment in the one case, so, we fear, it would afford an unsafe basis for the judgment which we are asked to render in the other. It is said that the conditions might, or would, have been different during the last three years of the contract; but it was for the defendant to make it clear that there might, or would, have been such a change in the conditions as would have enabled it to accomplish that which, in actual experience, it had failed to accomplish, and this it has not done. We find from the record that whilst the contract was in force there were complaints from both parties; but until plaintiff filed this suit neither party considered the other sufficiently at fault to justify any particular action, and we see no reason for holding, either that defendant would have acted with respect to the conditions of which it complained, or that during the balance of the term of its contract it would have found no cause of complaint, nor has our recent investigation convinced us that its failure to realize a profit in its actual operations is to be attributed either to a lack of time for preparation or to anything that was done, or left undone, by plaintiff. We are, however of the opinion that, in this view of the matter, defendant is entitled to recover for the loss sustained by reason of the fact that it made an outlay of money for the purposes and upon the faith of a contract which was to have continued for five years, but which, through the fault of plaintiff, as we have held, was terminated within two years, the amount of which loss is to be measured by the depreciation, up to the date of the institution of this suit, in the value of the property of plant in which the money was invested, consisting of pull boats, tow boats, house boats, camp boats, pile drivers, barges, tools, etc., all valued by defendant, for the purposes of this suit, at something over $21,-

000, though it appears to have been offered to the plaintiff for $19,000. In some respects this valuation is manifestly unreasonable, as, for instance, in the matter of pull boat 1, which was purchased by defendant's president, for his own account, for $2,500 and sold to defendant, within a few days, for $4,000, and is now valued at $7,625.50; this valuation including all the wire rope with which it has from time to time been supplied, and the greater part of which has been worn out in the service in which the boat was engaged.

Upon the other hand, a portion of the plant, such as the house and camp boats, barges, dinkies, and camps, had little or no value save for the purposes of the particular contract for which they were acquired. Without lengthening this opinion by entering into further detail, we conclude that $5,000 should be allowed on account of this item.

For these reasons it is ordered, adjudged, and decreed that the judgment heretofore rendered in this case, as also the judgment appealed from, be amended by reducing the amount thereof to $26,008.05, and that the former judgment of this court be further amended, in that defendant and appellee is now condemned to pay the costs of the appeal. It is further adjudged and decreed that in all other respects said judgment last mentioned be reinstated and made the final judgment of this court.

See dissenting opinion of PROVOSTY, J., 41 South. 357.